**Thomas A. ROUTES, Plaintiff,**

v.

**William HENDERSON, Postmaster of the United States Postal Service, Defendant.**

No. IP 97–494–C M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 21, 1999.

Tim A. Baker, AUSA, Office Of The United States Attorney, Indianapolis, IN.

## *ORDER FOLLOWING BENCH TRIAL*

McKINNEY, District Judge.

On November 16–18, 1998, the Court held a combination jury and bench trial on the claims of plaintiff, Thomas A. Routes ("Routes"), brought under the Rehabilitation Act (jury) and the Family and Medical Leave Act (Court). At the close of Routes' case in chief, the defendant, William Henderson, Postmaster of the United States Postal Service, moved for a directed verdict on both claims. That motion was granted on the claims brought under the Rehabilitation Act, 29 U.S.C. § 794, but denied with respect to those brought under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2615, 2617. The bench trial then continued, with the parties presenting evidence on all issues relating to the claims under the FMLA. At the close of all the evidence, the defendant again moved for judgment as a matter of law, which motion was denied and post-trial briefing was ordered in lieu of closing arguments. That briefing concluded on January 5, 1999, and the Court, having heard the evidence, reviewed the exhibits, and considered the facts in light of the relevant laws, now renders its final decision regarding the matters presented at trial.[1]

### *I. FACTUAL FINDINGS*

1. In 1979, plaintiff, Thomas A. Routes ("Routes"), began working for the United States Postal Service ("USPS") at the Nashville, Indiana post office as a part-time flexible clerk. As such, he was responsible for sorting packages, letters, and flats of mail, as well as assisting customers who needed stamps or other postal services. On Sundays, he delivered express mail, and other days he completed deliver-

Kenneth E. Lauter, Haskin Lauter Cohen & Larue, Indianapolis, IN.

---

**1.** This opinion shall constitute the findings of fact and conclusions of law required by Fed. R.Civ.P. 52(a). Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.

ies or retrieved mail from other locations when necessary. In 1984, Bruce Gould ("Gould"), became the postmaster of the Nashville Post Office, and he was Routes' immediate supervisor at all times relevant to this action.

2. There are no formal, written job descriptions for part-time flexible clerks. Part-time employees, described in the collective bargaining agreement (the "CBA") between the USPS and the American Postal Workers Union (the "Union"), are those "assigned to regular schedules of less than forty (40) hours in a service week, or [who] shall be available to work flexible hours as assigned by the Employer during the course of a service week." Ex. 42, CBA Art. 7.1(A). As Routes was a part-time "flexible" clerk, he was expected to be available to work flexible hours as assigned during the course of a service week. A service week is defined in the CBA as a "calendar week beginning at 12:01 a.m. Saturday and ending at 12 midnight the following Friday." *Id.* Art. 8.2(A).

3. The USPS interpreted the CBA provisions regarding part-time flexible workers as establishing a requirement that these workers be available seven days a week, and Routes was often scheduled to work a portion of the day six or seven days a week. He understood that he was expected to be available for work at any time, but it was customary for him to get every third Sunday off. From August of 1994 to December 31, 1994, Routes worked a total of four weeks at seven days a week, or 25% of the time, and five weeks at six days a week, or 31%. Ex. A. The remaining weeks were five days a week or less. Altogether Routes worked more than five days a service week during nine out of sixteen weeks, or 56% of the time. *Id.* From January 1, 1995 to August 30, 1995, he worked a total of sixteen weeks at seven days a week, or 44%, and fourteen weeks at six days, or 39%. *Id.* The other six weeks were five day weeks or less. This means that during this thirty-six week period of time Routes worked more than five days a service week during thirty weeks, or 83% of the time. *Id.*

4. Routes suffers from alcoholism, and during the time in question, he also suffered from depression and migraine headaches. In 1991, Routes was diagnosed with pancreatitis (caused by alcoholism) and was told by his doctor that he should stop drinking. *See* Ex. 3. Subsequently, he began seeing Dr. Frank Miller ("Dr.Miller"), who is a psychologist specializing in addictions. Dr. Miller treated Routes for his addictions from approximately September of 1992 to the Spring of 1996. That treatment ended when Dr. Miller thought he had done all he could for Routes and Routes appeared to be in "remission." Routes tried to comply with his doctor's instructions by not drinking, but he had a "number of relapses." Ex. 49. According to Dr. Miller, Routes often felt overwhelmed by events in his life, including the fact that he could no longer drink as he had before due to the pancreatitis. *Id.* Dr. Miller thought these factors may have led to Routes' depression. *Id.*

5. Gould became aware of Routes' drinking problem when he suffered the pancreatitis attack in 1991, and testified that he knew Routes was a "party animal." After Routes was absent without leave in December of 1993, for having tested positive for alcohol during a routine test in connection with his probation for an earlier reckless driving conviction, Gould requested that the USPS Labor Relations Department ("Labor Relations") issue a letter of warning to Routes. In his request, Gould suggested that Routes be given information about the employee assistance program "pertaining to alcohol abuse." Ex. 5.

6. In 1992 the USPS began requiring Express Mail delivery on Sundays, which meant an increase in hours for the part-time flexible clerks who started working a seven-day week. By late 1992, Routes began complaining of migraine headaches to Dr. Miller. Ex. 49, Progress Note for Nov. 18, 1992. They occurred infrequently at first, but from December 1993 to December 1994, Routes experienced migraine headaches with increasing regularity to the point of almost daily occurrences. Ex.

C. He complained to Gould about them in December of 1993, and he took time off from work for treatment in early 1994. *See* Exs. C, D. That treatment involved inpatient care with intravenous steroids, which was not successful, several diagnostic tests including a CAT scan, an MRI, sinus x-rays, EEG and a number of blood tests, as well as treatment with a number of anti-depressants and anti-inflammatories. Ex. D.

7. Despite the doctors' efforts, Routes' headaches continued and interfered with his ability to sleep and concentrate, causing feelings of sadness and hopelessness. *Id.* Finally, in November of 1994, Routes began seeing Michael Wenzler, M.D., a psychiatrist who diagnosed him as having symptoms consistent with a major depression. Ex. 17, Letter dated Sept. 8, 1995. Dr. Wenzler began treating Routes with an anti-depressant and he appeared to improve. *Id.*

8. During Thanksgiving of 1994, after nearly a year of unsuccessful treatment for his headaches, Routes heard about the Diamond Headache Clinic in Chicago, Illinois, from a relative. He visited the Clinic on December 8, 1994, and was evaluated for treatment, at which time the clinic scheduled him for inpatient treatment beginning on December 12, 1994.

9. Routes requested sick leave for the period of time in which he would be hospitalized in Chicago, and he informed Gould that he needed the leave for inpatient treatment of his severe headaches. Routes did not specifically ask for FMLA leave for this absence. He was admitted to the Columbus Hospital on December 12, and discharged on December 19, 1994, in "stable and improved condition." Ex. C. Routes took thirty-two and one-half hours of sick leave during the week of December

10–16, 1994, although he was credited for having worked seven and one-half hours that week. Ex. A. The following week, December 17–23, Routes took thirty-two hours of sick leave and was credited with three hours of work. *Id.* When he returned to work, on or about December 23, 1994, Routes' schedule was reduced and he worked only twenty and one-half hours during six days of work the week of December 24–30. *Id.* It was similarly reduced the week of December 31, 1994 to January 6, 1995, during which Routes worked twenty-four hours on six days of work. *Id.*

10. When Routes asked Gould for sick leave to go to the hospital for his headaches, Gould was reluctant to approve it because it was the Christmas rush period, and he asked Routes why he had to get treatment then when he had been experiencing the headaches for a year. He also asked Routes to re-schedule his treatment for a less busy time at the post office. At trial, Gould admitted that he was upset with Routes for refusing to re-schedule the medical treatment to a less busy time of year. Although Gould made it clear to Routes that his absence would create a hardship, he nevertheless approved the leave because he believed he could not disallow sick leave, even during the holiday season.

11. Gould did not ask Routes for medical certification of a serious health condition, although he could have made that request under the FMLA. Because Routes had a physical or mental condition that involved inpatient care in a hospital, he did have a serious health condition as defined under the FMLA. Routes had worked for the USPS for more than fifteen years, and he had been employed for at least 1,250 hours of service during the previous twelve-month period.[2] Consequently, the

---

2. The parties dispute whether Routes had fulfilled the hours of work requirement, with the USPS arguing that Routes failed to document that fact. The Court, however, is satisfied that Routes has shown by a preponderance of the evidence that he routinely worked at least 1,250 per year. The evidence presented indicates that Routes worked 470.25 hours during

the last one-third of 1994, between September 1 and December 31, 1994. Ex. A. By multiplying that rate by three, the Court would find that he worked approximately 1,410.75 hours in 1994, which would satisfy the minimum hour requirement. Moreover, from August 31, 1994 to August 30, 1994, Routes worked a

leave Routes took in December 1994 qualified as FMLA leave.

12. After Routes returned from his sick leave, he and Gould got into a loud discussion about the fact that he had taken off during the holiday season. Routes testified that Gould was very angry with him and threatened to "get rid of" him. According to Gould, he was upset with Routes for taking leave for what he considered "elective medical care" during the busiest time of the year, and he told Routes he did not "need employees like that working for him." Regardless of the words used, the context and subject matter of Gould's statement led Routes to interpret it as a threat. Another employee, Julie Matlock, testified that she overheard Gould talking to Routes in a "loud and firm tone," and saying "you've done this before, you're undependable, you just can't do this." She also heard Routes justifying his actions about taking the leave. Fearing he might be about to lose his job, Routes promised Gould he would not take any more sick leave. In light of all the evidence on this point, the Court finds that Routes' interpretation of Gould's meaning was both reasonable and consistent with the subsequent conduct of both men.

13. On or about Christmas Eve, 1994, Routes returned home appearing very different than he had when he had left for work in the morning. He told his wife that Gould had yelled at him and threatened to fire him and that he did not want to see any family on Christmas Day. Although he no longer suffered from severe headaches, Routes stayed in bed until Christmas afternoon and did not seem to enjoy any of the holiday. His wife, who

testified at trial, reported that from that time on Routes just went to work and came home and went to bed.

14. From January 1 to August 30, 1995, Routes used only eight hours of sick leave, despite the fact that he broke his knee in July of 1995, during a time in which he was working about fifty hours a week. Ex. A. In contrast, from August 30 to December 31, 1994, Routes had taken a total of seventy-seven and one-half hours of sick leave. *Id.* This dramatic decrease in Routes' use of sick leave is consistent with Routes' testimony that he feared losing his job for having taken leave in December and had promised Gould he would no longer ask for any leave.

15. On or about December 27, 1994, Gould wrote to Labor Relations and asked them to issue a letter of warning to Routes for being "unavailable for work due to absences" for two weeks during the 1994 Christmas holidays. Ex. 8. A letter of warning is the first official step in the progressive discipline system established by the CBA between the USPS and the Union. Ex. 42, CBA at 109. In contrast, a disciplinary discussion is a private, informal discussion between the employee and supervisor when the employee has committed a minor offense. *Id.* at 108. Gould told Labor Relations in a subsequent letter that he had given Routes a disciplinary discussion for this absence. A discussion may be noted privately by either, but it is not to be included in the employee's personnel file and is not to be "cited as an element of prior adverse record in any subsequent disciplinary action." *Id.* at 109. The fact that Gould tried to initiate

total of 1,529.75 hours, or approximately thirty hours a week for fifty weeks. Gould testified at trial that Routes usually worked about thirty hours a week, while Routes testified he usually worked thirty-five hours a week. During the time Routes was out on designated FMLA leave, from September 1 to December 31, 1995, Gould deducted forty hours a week of paid leave. Ex. 38. At trial, he justified the use of this number of weekly hours by explaining that he "charged the number of hours Routes normally works." Finally,

Gould reported to Labor Relations in December of 1994 that Routes had been absent a total of twelve days in 1994, which does not represent a large enough decrease in the number of hours Routes worked during 1994 to overcome the other evidence that he more likely than not worked at least twenty-five hours a week for fifty weeks. For all these reasons, the Court finds that Routes worked at least 1,250 hours in the twelve month period prior to December 12, 1994.

official discipline against Routes for taking sick leave during December is consistent with interpreting Gould's statement as an expression of his intent to remove Routes from employment with the USPS.

16. In response to Gould's request for disciplinary action, Labor Relations asked for additional documentation of the need for discipline. Ex. 9. Gould did not supply the missing information, and testified that he just decided not to pursue it, without explaining why. The letter requesting disciplinary action had listed all of the days Routes was absent due to illness in 1994 and noted whether the absence was scheduled or unscheduled. Ex. 8. The two weeks Routes took off in December 1994 were listed as a scheduled absence. *Id.* Although Gould's action did not lead to official discipline of Routes for taking sick leave, it provided documentation of Gould's attitude at that time toward Routes' use of sick leave.

17. Also on December 27, 1994, the same day Gould asked Labor Relations for a letter of warning against Routes, Gould recorded a "disciplinary discussion" he had with Routes regarding a Consumer Service Card the post office had received in November, 1994. Ex. 10. The disciplinary discussion was in writing. *Id.* In it, Gould referred to Routes' behavior as "rude and unprofessional," and warned him that it would not be tolerated and that in the future Gould would not apologize to the customer for Routes. *Id.* Gould explained at trial that he wrote the disciplinary discussion and gave it to Routes when he returned from sick leave because Gould had to contact the customer while Routes was off work and apologize for the incident. The complaint form to which the letter refers, however, is dated November 8, 1994, and it reports that the customer was contacted on November 8, 1994, by Gould, and that he apologized to her and then had a discussion with the clerk. Ex. 11. Thus, the written disciplinary discussion given to Routes in December of 1994 was a second discipline for the incident, and the reason given by Gould for the delayed discipline is not supported by his own records. This conduct is consistent with an intention to communicate to Routes that his position was in jeopardy.

18. Nevertheless, Routes was given two weeks of light duty after his return from the December 1994 sick leave, without his needing to supply a medical certification. For the next six weeks after that, however, he was scheduled to work seven days a week. Ex. A. In fact, Gould began scheduling Routes to work seven-day weeks much more often than he had before Routes took sick leave during the holiday season. From September 1, to December 31, 1994, Routes had been scheduled to work a 7–day work week only 25% of the time. In contrast, from January 1, to August 30, 1995, 44% of his scheduled work weeks were for seven days.

19. Similarly, from September 1, to December 31, 1994, Routes was scheduled for a 6–day work week 31% of the time. After his sick leave, he was scheduled to work a six-day work week 39% of the time. In sum, before Routes took the sick leave Gould disapproved, he had been scheduled to work more than a five-day work week 56% of the time. After his leave, he was scheduled to work more than a five-day work week 83% of the time. This dramatic increase in the number of six or seven-day work weeks is consistent with Gould's displeasure with Routes for taking the December 1994 leave.

20. In July of 1995, the Nashville Post Office changed locations and opened a "postal store," which caused all employees to work longer hours. According to Gould, Routes worked more than fifty hours a week during this period, while other employees worked even longer hours. Gould described the process of moving the post office location as the most significant event he had ever been through as a postal employee. It was at this time that Routes broke his knee, but he took only eight hours of sick leave and still worked forty and three-quarters hours that week. Ex. A at 3. This behavior is consistent with

Routes' testimony that he feared he would lose his job if he took any more sick leave.

21. After he broke his knee and finished two more 7–day work weeks, at forty-eight and forty-nine hours each, Routes took two weeks of vacation from August 5, to August 19, 1995. Ex. A. When he returned, he worked another seven-day work week from August 19 to the 25th, and was scheduled for another one from August 26th to September 1, 1995. *Id.* However, he only worked five days of the second week, with his last day of work being August 30, 1995. By the evening of that last day of work, Routes' depression had progressed to the point where his wife insisted that he get additional medical attention. She feared he was suicidal.

22. August 31, 1995, Routes was admitted to Bloomington Hospital under the care of Dr. Larry C. Lawrence, who signed a written notice that same day to let Gould know that Routes would be in the hospital for approximately one week. Ex. 13. The letter was postmarked August 31, 1995, and was received by Gould at the Nashville Post Office the next day, as evidenced by the fact that Gould noted on its envelope that he sent "Return to Work" documentation to Dr. Lawrence on September 1, 1995. *Id.* Routes' wife also had contacted Gould in the afternoon of the day Routes was admitted to the hospital, and told him her husband was in the hospital and would be off work for a while. She did not specify the reason for Routes' admission.

23. Because Routes had been scheduled to work at 6:00 in the morning of August 31 and he did not call before then, Gould sent a letter to Labor Relations that same day asking for official disciplinary action against him. Ex. 14. According to Gould's letter, Routes "failed to report to work, he failed to notify this office as to the reason for his absence, and his telephone line was busy each of the six times [Gould] attempted to call him...." *Id.*

Gould also wrote that Routes "received a disciplinary discussion for being unavailable for work due to illness in December, 1994," and he asked that Routes be given "the maximum appropriate disciplinary action available." *Id.*

24. Again, Labor Relations asked for additional documentation needed for such discipline, and Gould did not follow through with supplying it. At trial, Gould indicated that he had written the request for discipline before he knew that Routes had been hospitalized. Once he received that information, however, Gould did not withdraw his request for discipline. In fact, as late as November 22, 1995, Gould considered disciplinary action still pending against Routes for that absence, and he testified that he was keeping his "options open" with respect to Routes' absent without leave ("AWOL") status on that date. The USPS uses a form "3971" to report employee absences, and Gould completed one for August 31, 1995, showing Routes as AWOL that day.[3] Ex. 38. The next day, September 1, 1995, Gould recorded Routes' absence as approved FMLA sick leave. *Id.*

25. Shortly after learning that Routes had been hospitalized, Gould contacted Labor Relations by telephone about getting a fitness for duty evaluation ("FFDE") of Routes before he could return to work. He made this inquiry even before he had received a letter from Routes' treating psychiatrist explaining why Routes had been admitted to the hospital. At trial, Gould testified that he and Labor Relations decided to wait for documentation from Routes' doctor before initiating the FFDE process.

26. On September 12, 1995, Gould received a letter from Dr. Michael Wenzler ("Dr.Wenzler"), a psychiatrist who had been treating Routes for depression. Ex. 17, Letter dated Sept. 8, 1995. Dr. Wen-

---

3. The Court notes that the first page of Exhibit 38 contains a copy of the Form 3971 for September 31 and September 1, 1995. Judicial notice is taken of the fact that there are only thirty days in September, and thus the exhibit is viewed as evidence of how Routes' absences were recorded for August 31 and September 1, 1995.

zler reported that Routes had been under his care for treatment of major depression since November 11, 1994, and that he had admitted Routes to· the hospital with a "deteriorating mood, suicidal ideas, a low energy level, difficulty sleeping, and a lack of motivation." *Id.* The doctor also wrote that Routes appeared to have been under a "good deal of stress at work and had been working seven days a week." *Id.* According to the letter, Routes was discharged from the hospital on September 8, 1995. *Id.* Dr. Wenzler wrote, "I suggested to Mr. Routes that: 1) he decrease his stress levels; 2) he should not return to work until September 18, 1995; 3) when he returns to work, he should work a lighter schedule of five days per week (though he may return to full duties during those days); and 4) I will continue to frequently monitor his progress as an out-patient." *Id.* Dr. Wenzler stated that he was unable to predict how long it would be before Routes was "sufficiently recovered" to work seven days a week. *Id.* This letter accompanied Form WH–380, Certification of Health Care Provider ("Form 380"), a form devised by the Secretary of Labor and used by the USPS to facilitate certifications of FMLA leaves or returns from leave.

27. The day he received the letter from Dr. Wenzler, Gould sent a memorandum to William E. Morrison ("Morrison"), the manager of Post Office Operations, requesting a FFDE of Routes. Ex. 18, Letter dated Sept. 12, 1995. The FFDE request stated that a disciplinary action was pending against Routes for being AWOL on August 31, 1995, and that he had not returned to work since that date. *Id.* It also referenced Dr. Wenzler's letter, which was attached, and listed examples of Routes' behavior prior to the leave that Gould believed warranted this action. *Id.* At trial, Gould testified that he relied on the pending disciplinary action against Routes for the August 31, 1995, absence to support this request for a FFDE. In the FFDE request, Gould wrote that "throughout Routes' work history" he has exhibited "severe and unpredictable behavioral patterns," and that during a discussion "several years ago" Routes "threatened to burn my house down." *Id.* He also noted that Routes was arrested for "DUI" three years earlier and that he was cited for a "probation violation" a year and a half later for failing an alcohol test. *Id.* At trial, Gould admitted that the threat to burn his house down occurred five to ten years prior to the FFDE request, and Routes had received no discipline for the statement.

28. The FFDE request also stated that Routes had suffered severe migraine headaches for the last eighteen months, resulting in two one-week hospitalizations, and that he was still being treated for the headaches. *Id.* One of the hospitalizations, Gould emphasized, was during the Christmas rush in 1994, for which Routes was given a disciplinary discussion. *Id.* According to Gould, Routes was taking "what I would consider very strong medication from at least four different doctors at the same time." *Id.* At trial, Gould admitted he did not know what medications Routes was taking, or how many doctors had prescribed it.

29. Elaborating on Routes' workplace behavior, Gould wrote that "over the years" he has given Routes at least two disciplinary discussions, plus issued two letters of warning for "tempermental [sic] verbal explosions directed at fellow employees." *Id.* The USPS could not provide the Court with any letters of warning for verbal explosions, and only one discussion was recorded that concerned Routes' treatment of co-workers.[4] Others in the

---

4. In that written disciplinary discussion, dated June 21, 1994, Routes was told that his "approach to offering corrective or training information or criticism of activities by fellow employees" is unacceptable. Ex. 7. Although Routes' "normal voice sometimes sounds harsh and raspy," he was told to "address fellow employees in a sensitive, caring manner" or not at all. *Id.* The discipline was occasioned by Routes' reprimand of a co-worker that caused her to cry. *Id.*

office, who did not know why Routes was in the hospital, were reluctant to have Routes return to work. *Id.* Over the past several months, Gould stated, "Routes' attitude, job performance, and motivation have depreciated markedly." *Id.* Finally, "based on Routes' history of unpredictable and violent outbursts" and based on information from his doctor, Gould said he considered Routes "to be a threat to this office and himself." *Id.* Unless directed otherwise, he wrote, his intentions were "to not allow Routes to return to duty in this office until a FFD states that he is capable of performing all of his duties, to include working seven days per week." *Id.*

30. Two days after his formal request for a FFDE Gould initiated an internal investigation of Routes by notifying the U.S. Postal Inspector on September 14, 1995, about an "alleged employee assault/threat" involving Routes, giving an occurrence date of August 31, 1994, at 9:00 a.m. Ex. 24, Report dated Oct. 17, 1995. The Postal Inspector's report stated: "Postmaster Gould requested a fitness for duty (psychological examination) for clerk Thomas A. Routes. Gould notified Inspection Service as info. I have made contact. I am monitoring situation. No further action warranted at this time." *Id.* It was signed by Pat Sheehan and dated October 17, 1995. *Id.*

31. At trial, Gould testified he considered Routes "a threat" and that is why he contacted the Postal Inspector. He said Routes' hospitalization for "suicidal tendencies" confirmed for him that Routes was capable of physical violence.[5] From the report and letter, it was clear that Inspector Sheehan had investigated Routes and learned he had no FBI or

Local police records, no post office disciplinary records, and no "write-ups" relating to violence. Ex. 24. Although Gould did not specifically recall getting the Inspector's report, he admitted at trial that it contained the same advice he had gotten from Inspector Sheehan by telephone. As of October 17, 1995, Gould was aware of the fact that the Postal Inspector was not continuing to investigate Routes and had found no evidence of any violent conduct at work or elsewhere.

32. Routes was admitted to Fairbanks Hospital in Indianapolis on September 15, 1995, for treatment of alcoholism. He had been discharged from the Bloomington Hospital on September 8, with a projected return to work date of September 18, 1995. Before he could return to work, however, Routes underwent this second hospitalization. His doctor at Fairbanks, Dr. Timothy Kelly ("Dr.Kelly"), notified Gould about the hospital admission on September 17, 1995, and stated that the length of stay was "unknown" at that time. Ex. 20. In a subsequent response to the Form 380 sent by Gould, Dr. Kelly indicated that Routes would be incapacitated by his condition from approximately September 15 to October 15, 1995. Ex. 21. Dr. Kelly gave the reason for Routes' treatment as "detox & rehab." *Id.* The completed Form 380 was received by Gould on September 22, 1995. Approximately one week later, on September 30, 1995, Routes was discharged from the hospital and released by Dr. Kelly to return to work on October 9, 1995. Ex. 22. The release contained no restrictions on Routes' ability to work. *Id.* Gould received the release from Dr. Kelly sometime during the first week of October, 1995.

---

5. Dr. Wenzler had reported that Routes was admitted to the hospital with "suicidal ideation," a term used to indicate a person is thinking about suicide. *See* Stedman's Medical Dictionary, 26th ed. (ideation is defined as "the formation of thoughts or ideas"). A tendency, on the other hand, connotes something more than just thinking about suicide. The word tendency refers to "direction or course toward a place, object or result" or "a presumptive course of future behavior in continuation of observed acts and attitudes." Webster's Third International Dictionary. The Court finds that Gould's use of the word "tendency" was not based on medical documentation of Routes' condition, but on his own interpretation of that documentation.

33. At about the same time, Dr. Wenzler wrote a second letter regarding Routes' condition, dated October 16, 1995, that was received by Gould shortly thereafter. This letter explained more fully the reasons for Routes' second hospitalization. After referring to Routes' August 31, to September 8, 1995, hospitalization for depression, Dr. Wenzler reported that Routes's treatment was "complicated by continuing, covert alcoholism." Ex. 23. Routes had denied his continued alcohol consumption to his doctors, his wife, and his AA sponsor, but after his release from the Bloomington Hospital, his wife and AA sponsor confronted him and he confessed. He then agreed to in-patient treatment at Fairbanks, where he was hospitalized from September 15 to September 30, 1995. *Id.*

34. Dr. Wenzler wrote that he saw Routes on October 5, 1995, at which time Routes denied any more drinking or feelings of depression. Ex. 23. Routes reported that he was participating in Intensive Out–Patient ("IOP") addictions treatment at a mental health center, continuing to see his addictions therapist, Dr. Miller, attending AA meetings regularly, and that he would continue working with Dr. Wenzler on his depression. *Id.* According to Dr. Wenzler, Routes' "prognosis will be improved a great deal if he works only five days a week. Two days off will give him the time and energy to continue to work his alcoholism recovery program more fully and to recover from depression." *Id.* Again, Dr. Wenzler concluded by stating that he could not predict when Routes would be able to return to a seven-day work week. *Id.* At trial, Gould testified that he did not consider Dr. Wenzler's letter a restriction to light duty—just a letter from the doctor returning Routes to work. He also agreed that Routes had been released to return to work by Dr. Kelly with no restrictions. Later, Gould testified that "there was quite a bit of confusion over [Routes'] restrictions."

35. In response to Routes' request to return to work, Gould told him he would not let him return until he could work seven days a week. Gould testified that a FFDE under these circumstances was "automatic," because Routes had wanted to work only five days a week. Routes testified, however, that he told Gould he would work seven days a week if it was necessary, but that he preferred not to. Gould has not contradicted this testimony, and has admitted that Routes never told him he could not work a seven day week. In its decision granting a directed verdict to the USPS on Routes' Rehabilitation Act claim, the Court found that Routes had failed to prove he was disabled, in part because he specifically testified that he was able to work or be available for work up to seven days a week. At trial, Routes' estranged wife testified that she overheard a message from Gould in early October 1995 to the effect that he would never let Routes return to the post office. Gould, on the other hand, stated that he told Routes there was no "light duty position" at the Nashville Post Office, by which Gould meant a part-time flexible position limited to five days a week, and there would never be one. Regardless of the language used, Gould's message that he did not want Routes to return to work at the post office was clearly communicated to Routes.

36. After receiving the second letter from Dr. Wenzler and Routes' request to return to work, and in spite of the full release by Dr. Kelly, Gould wrote again to the USPS Medical Officer, Dr. Ranjan Patel ("Dr.Patel"), and asked for a FFDE. Ex. 25. The second request was dated October 19, 1995, (two days after Postal Inspector Sheehan's report), and it contained enumerated items that Gould wanted the FFDE report to address. *Id.* In it, Gould referred to Routes' "extended absence for treatment for suicidal tendencies and drug/alcohol rehabilitation," and noted his prior conversation with Dr. Patel, in which they had decided not to initiate the FFDE until Routes asked to return to work. *Id.*

37. In the second FFDE request, Gould wrote that over the years Routes has "unpredictably exploded verbally" at Gould and other employees in "fits of rage." Ex. 25. Gould noted that he had taken "disciplinary action many times," but "given the broad time frame" Routes had "never gotten more than a letter of warning." *Id.* He then asked Dr. Patel about the "probability of his tempermental fits continuing." *Id.* Gould also asked whether Routes' "rages [were] related to his alcohol/drug problem." *Id.* Although Dr. Wenzler had referred only to an alcohol problem, Gould began describing the problem as "drug/alcohol" or "drug-related" in this second request for a FFDE. At trial, Gould could not produce any documentation that he had taken "disciplinary action many times" for Routes' "fits of rage." Instead, he referred to three unspecific and undocumented incidents of Routes yelling at co-workers, two letters of warning for similar conduct that could not be found, a five to ten year old threat to burn Gould's house down, and a disciplinary discussion in 1990, all of which "made a history" of violent outbursts in the workplace, in Gould's mind.[6]

38. Next, Gould noted that Routes claimed his depression was related to stress from his job, and observed that in the past eight months Routes had worked fewer hours than anyone else. Ex. 25. Gould wanted to know what parts of his work caused Routes stress, and speculated that it was the computerized equipment. If this were true, Gould stated, there would be no light duty work available for Routes at the Nashville Post Office. *Id.*

39. Gould reported in this FFDE request that he understood from one of Routes' friends that Routes and his wife blamed Gould's December 1994 "disciplin-

ary discussion" for Routes' absence during the holiday rush, for "aggravating his depression." Ex. 25. Then he questioned "where he stands" with Routes, given his "violent temper, his suicidal tendencies and his blaming me for part of his personal problems," and expressed concern about Routes' "feelings of resentment, hatred, etc." Gould wanted the FFDE report to tell him whether Routes' "suicidal tendencies and drug/alcohol problems are resolved." *Id.* He also asked whether Routes had expressed any particular method of committing suicide. *Id.*

40. Finally, Gould noted that he had just finished a "Violence in the Workplace" seminar the day before, and he asked for guidance from Dr. Patel, an EAP representative, the Postal Inspector and Labor Relations about "how to quickly take disciplinary action if needed or remove the employee from the office." Ex. 25. According to Gould, the USPS has always had a policy of "zero tolerance" of violence in the workplace, although posting the policy as he did in August of 1995 was new. *See* Ex. 12. He also testified that the violence seminar taught him how to recognize threats of violence in the workplace. He concluded this second request for a FFDE by expressing his concern about Routes' "mental stability," and the safety of himself and others in the office, "most of whom [Routes] has verbally attacked at one time or another." Ex. 25.

41. At trial, Gould said the reason he sent the second FFDE request was that Routes had contacted him to return to work and he had not received any FFDE report yet. However, Gould also testified that he and Dr. Patel had agreed to wait until Routes actually tried to return to work before starting the FFDE process.

---

6. Although two witnesses testified at trial about Routes' "loud and demeaning tone" with co-workers, the fact that some co-workers cried experiencing Routes' anger, and about how he treated women in a condescending manner, the witnesses did not say they had complained to Gould about Routes' behavior. Gould admitted the had been un-

aware of any incidents involving Julie Matlock, but that he had known of Routes' insult to Kathy Bastin. Both women testified that after Routes was hospitalized, Gould warned them to lock themselves in a safe room and call Gould if Routes ever returned to the post office.

Consequently, it would not have been reasonable to expect to have a FFDE report at the time Routes asked to return. Gould's expressed reason for the second FFDE request appears not to have been the real reason. In a letter dated October 23, 1995, Gould informed Routes that he had been scheduled for a psychiatric FFDE with Dr. Frank Countryman ("Dr.Countryman") on October 30, 1995. Ex. 26.

42. Dr. Patel, the USPS Medical Officer for the area, wrote Dr. Countryman on October 24, 1995, and informed him about the need for Routes to be evaluated by a psychiatrist. The letter stated that the examination was requested by Routes' manager to determine if Routes could "perform the duties of a part-time flexible clerk, without harm to himself or others." Ex. 27. She also wrote that Routes had been absent from work for treatment of "suicidal tendencies and drug/alcohol rehabilitation" and that he had been under the care of Dr. Wenzler who had released Routes to return to work. *Id.* According to the letter, Dr. Patel sent Dr. Countryman all of the "pertinent information" including a "job description" and the two letters from Gould requesting the FFDE.[7] She stated that the Nashville Postmaster "is reluctant to let him come back to work because of his past violent and threatening behavior with his supervisors and coworkers." *Id.*

43. The USPS uses a form letter to authorize all mental FFDE evaluations, which contains specific guidelines for the type of information needed for a complete psychiatric evaluation. Ex. 28. Specifically, the doctor is to report on the patient's social and family history, history of the present illness, "including a detailed description of the specific work factors contributing to the present emotional or mental condition," and a mental status examination, complete with pertinent clinical findings and results of any tests. *Id.* The

report must also include a diagnosis according to the DSM IV, and a "well reasoned opinion as to the factors of employment that caused, aggravated, precipitated or accelerated the presenting condition." *Id.* The doctor is to include a prognosis with a return to work date and an opinion regarding recommended treatment. *Id.* Finally, the report should address the "duty status" of the employee, with a description of any limitations in the employee's ability to work, and the doctor's findings with regard to whether the employee is capable of violence or presents a danger to self or others. *Id.* Dr. Patel signed a copy of this authorization letter on October 25, 1995, at which time it was sent to Dr. Countryman.

44. After meeting with Routes on October 30, 1995, Dr. Countryman reported to Dr. Patel that Routes was defensive and angry at first, and then friendlier toward the end of their hour together. Ex. H, Letter dated November 1, 1995. Dr. Countryman wrote that Routes has been "extremely depressed in the past" and is still "moderately depressed," as evidenced by occasional crying spells. *Id.* He found no psychomotor retardation or psychotic thought processes, and opined that Routes' "insight and judgment appear to have been only fair." *Id.* It was Dr. Countryman's recommendation that they order psychological testing of Routes, and contact Routes' treating psychiatrist and psychologist to get more complete reports than he had received from Dr. Wenzler. *Id.* The psychological testing was scheduled for December 1, 1995, with Dr. Christine Ward ("Dr.Ward"), but there is no evidence that Dr. Countryman contacted either Dr. Wenzler or Dr. Miller.

45. Unsatisfied with the progress of the FFDE process, Gould wrote to Labor Relations on November 22, 1995, approximately one month after his second request for a FFDE, and asked for Routes' termi-

---

7. The Court questions whether a written job description was forwarded to Dr. Countryman as no such job description was produced at trial. Moreover, Gould testified that there was no written job description for part-time flexible clerks.

nation. Ex. 29. His request came even before Gould had been told that Routes was not fit for duty, and despite the fact Routes' doctors had released him. *Id.* This request for termination was made while Routes was still on FMLA leave. The reasons given by Gould for the termination included that Routes was AWOL on August 31, 1995, and he had not worked since then because he was on FMLA leave. *Id.* According to Gould, the "120–day period" would be up on December 29, 1995, at which time Routes would have no sick or annual leave remaining. *Id.* His letter was intended to "get the process started to have this employee separated as soon as possible after his 120–day period expires." *Id.*

46. At trial, Gould said that Routes was not protected from discipline for his absence on August 31, 1995, because he "had not advised me that he had been admitted on the 31st." The parties' stipulated exhibits, however, provide evidence that Gould was well aware of that fact, and Gould even testified that Routes' wife called him the afternoon of August 31st to say Routes was hospitalized for an illness and would be out for a week or two. The Court finds that Gould was advised on August 31, 1995, that Routes had been admitted to the hospital for a serious health condition. At trial, Gould admitted that he was using the fact that Routes was "AWOL" on August 31, 1995, to justify the need to terminate Routes.

47. Gould's letter requesting Routes' termination also cited Gould's interpretation of the reasons Routes had been absent—treatment for "alcoholism/drug abuse" and "major depression resulting in suicidal tendencies." Ex. 29. He wrote that Routes "has a history of violent outbursts in the workplace," he has been given a psychiatric FFDE, and that Routes' psychiatrist said part of his depression is "job related." *Id.* Further, Gould wrote that Routes was released for work "under restrictions that he could not work over

five days per week for an indefinite period of time (light duty) due to job stress."[8] *Id.* According to Gould, there were no light duty positions in the Nashville Post Office. *Id.* Then he mentioned that he had not yet heard from Dr. Patel, but he was aware that Routes was scheduled for another evaluation by a psychiatrist retained by the postal service. Gould's feelings were that "at about $600 per session, the postal service could spend a considerable amount of money with inconclusive information" about Routes being able to return without risk to himself or others. *Id.*

48. At trial, Gould said he thought the USPS should terminate Routes rather than spend any more money on inconclusive psychological evaluations. He described this letter as an attempt to get the process started to have Routes terminated as soon as possible. In the letter to Labor Relations, Gould stated that "Postal Inspector Pat Sheehan is also involved," in Routes' "case because of our concern over the employee's violent history." *Id.* This statement was made a little more than one month after Gould was told by Inspector Sheehan that Routes had no discernible violent history and that the Postal Inspector did not think "further investigative attention" was warranted. Ex. 24.

49. Despite Gould's efforts to get Routes terminated, on or about December 1, 1995, Dr. Ward administered three psychological tests on Routes—the MMPI–2, the Rorschach test, and the Thematic Apperception Test ("TAT"). Ex. G, Letter dated December 1, 1995. She also interviewed Routes for about fifteen minutes, during which time she gathered some background information about him and his current problems. In response to her question about why he was there for evaluation, Routes told her "I guess they think I'm dangerous." *Id.* Routes speculated that the reason his employer thought he was dangerous was that "he had been feeling depressed and suicidal" and he as-

---

8. This statement is contradicted by Gould's testimony at trial about the confusion con-

cerning whether Routes was restricted from performing all of the duties of his position.

sumed that "if work thinks I'm suicidal, then I'm dangerous." *Id.*

50. The results of the three tests were reported as follows. The Rorschach responses were "typical of individuals prone to acting out—either against themselves or toward others," and some of Routes' "precepts" involved "morbid content, high emotionality, and injury." Ex. G. Dr. Ward observed that Routes seemed aware of the inappropriateness of some of his responses, but that he went ahead and reported them anyway. *Id.* The TAT responses provided by Routes were "typical of individuals who are depressed, worried, suicidal." *Id.* She found his MMPI–2 results valid, but said Routes tended to minimize his problems. *Id.* Although she included the profile of Routes' results, Dr. Ward found noteworthy "the large number of clinical scales in the critical range for psychopathology," explaining that "individuals with this profile are extremely depressed." *Id.*

51. The MMPI–2 test revealed that Routes' energy level was "extremely low," and Dr. Ward thought this was consistent with an individual who is self-critical and self-defeating. *Id.* "While there may be some real security threats, these individuals often show denial and covering over. There is often a quickness to rationalize and explain things away." *Id.* She found that he had "considerable potential for impulse control problems" *Id.*

52. In her summation of the test results, Dr. Ward stated that "given the low base rate of acting-out behaviors, making a highly accurate prediction is virtually impossible." *Id.* Routes' psychological tests indicated a "man who is highly depressed, suicidal, and worried." She noted, however, that there were a "number of positive indicators for his recovery, including his participation in the IOP program, medications, the AA meetings, and his outpatient psychiatrist Dr. Wenzler." In her opinion, Routes should continue with all of these treatment services until he was better stabilized. *Id.*

53. Dr. Countryman's final report to Dr. Patel indicated that the results of Dr. Ward's psychological testing "verify that Mr. Routes is definitely depressed." Ex. 46, Letter dated Dec. 7, 1995. Although noting the "numerous positive indicators for recovery" mentioned by Dr. Ward, Dr. Countryman stated he did not think Routes was "sufficiently recovered to return to work." *Id.* He did not, however, elaborate on that opinion. Then he said, "[b]ecause of the long-term chronicity and severity of his problems, I think it is possible that he should be retired." *Id.* He wrote that with Routes working "seven days a week as he does in his present job he has no opportunity to regroup his defenses." *Id.* Dr. Countryman concluded by saying that he thought "medical retirement" would be in Routes' best interest. *Id.*

54. Upon receiving Dr. Ward's test results and Dr. Countryman's final report, Dr. Patel reviewed them and concluded that Routes was not fit for duty. Ex. I. She conveyed that opinion in a three-sentence note to Gould dated December 11, 1995. *Id.* In it she wrote that the "doctor indicated that Mr. Routes does have an ongoing psychiatric problem, which has not adequately responded to treatment. Therefore, he is not fit for duty at this time. His prognosis is poor and the doctor is recommending disability retirement." *Id.* Dr. Patel's note was received at the Nashville Post Office on December 12, 1995. *Id.*

55. Dr. Wenzler provided Routes with another release dated December 14, 1995, which Gould testified he did not receive. Ex. 44. It stated that Routes was "released to return to work on 10/9/95," and was signed by Dr. Wenzler. *Id.* On December 15, 1995, Morrison, as manager of Post Office Operations, wrote the Human Resources Manager requesting that she have Labor Relations "issue the appropriate letter to Mr. Routes to advise him of his options." Ex. 30. In his note, Morrison specifically referred to information

from Dr. Patel that he had attached to his request. *Id.* On December 28, 1995, Morrison wrote to Dr. Patel and asked her to provide him with "whatever medical documentation" he could have on Routes because a Union grievance had been filed. Ex. 31. According to Morrison, the Union grievance stated that Routes had been cleared by his doctor to return to work, and Gould had told Morrison that Dr. Patel had determined Routes was unfit to return to duty. *Id.* Therefore, it appears that Morrison only had Dr. Patel's short note when he wrote and asked that an option letter be issued to Routes. The evidence shows that Morrison also had received Gould's letter requesting a FFDE and had discussed Routes' condition with Gould and perhaps with Dr. Patel.

56. In a letter dated January 22, 1996, prepared by Labor Relations and signed by Gould, Routes was told that he had been found unfit to return to duty as a part-time flexible clerk. Ex. 34. Routes was given three options: he could retire, resign or request permanent light duty. *Id.* The permanent light duty request would have to be accompanied by a medical certificate from the United States Public Health Service, or a physician designated by the postmaster, "giving full evidence of the physical condition of the employee, the need for reassignment, and the ability of the employee to perform other duties." *Id.* A certificate from Routes' personal physician would not be acceptable. *Id.* At the time, Routes was not suffering from a *physical* condition and he had already been informed that there were no light duty positions at the Nashville Post Office.

57. Routes wrote a letter in response to the option letter and stated that he was released by his own doctor and by the Fairbanks Hospital doctor to return to work on October 9, 1995. Therefore, he did not consider the three options applicable to him. Ex. 35. He expressed his desire "to return to work as soon as possible in accordance with [his] release." *Id.* He further stated that since he was pursuing a grievance through the Union, he had been advised by the Union not to respond to any of the options. *Id.* Finally, he asked again for copies of the medical evaluations by Dr. Ward and Dr. Countryman. *Id.* This letter was received by Labor Relations on January 30, 1996.[9] *Id.*

58. From December 4, 1995, and throughout all of 1996, the Form 3971's filed for Routes were completed by Gould with a designation that Routes was on leave without pay ("LWOP"). Ex. 38. LWOP is allowed for certain specified reasons stated in the USPS employee and labor relations manual ("ELM"). Ex. 41. The reason applicable to Routes' situation is for "personal illness or injury." *Id.*, ELM, ¶ 514.4(D)(4). It also provides that an employee may be separated from employment for being on LWOP for more than one year due to illness, "unless there is cause to expect recovery and return within a reasonable time after the end of 1 year." *Id.*

59. On or about December 30, 1996, a note was sent to Gould from the Human Resources Department, stating that "Per Labor Relations you need to initiate a removal for Routes." Ex. 32. On January 7, 1997, Gould submitted a request through Morrison to remove Routes from employment with the USPS. Ex. 36. It explained that Routes' last day of work was August 31, 1995,[10] and that he had been on LWOP status in excess of one year, which "violates section 514.4(D)(4) of the ELM, thereby providing for removal." *Id.* It did not mention whether there was cause to expect Routes' recovery in a reasonable

---

9. The Court notes that the exhibit indicates a "received" date of January 30, 1995, for a letter dated January 29, 1996. Given the testimony at trial about this letter, the Court finds that the date stamp used by the Labor Relations Department was inaccurate, and should have read "1996."

10. Since Gould designated Routes as AWOL on August "31," 1995, the Court assumes he meant to write August "30," 1995, on his request form as the last day Routes worked.

period of time. If Morrison concurred with Gould, he was asked to forward the request to Labor Relations. *Id.*

60. Morrison concurred with the decision to remove Routes and submitted the request to Labor Relations on January 16, 1997. Ex. 33. A memorandum "Notice of Removal" dated January 17, 1997, was sent to Routes, informing him that he would be removed from the Postal Service on February 24, 1997. Ex. 37. The notice stated that Routes was being removed for "being on LWOP status in excess of one year." *Id.* It further stated that Routes was sent for a FFDE on December 7, 1995, "which stated you could not perform the duties of your position. On January 22, 1996, you were sent a letter giving you options toward your position. You have not responded." *Id.* The Notice of Removal was signed by Gould and Morrison. *Id.*

61. This action against the USPS was filed by Routes on March 25, 1997, approximately one month following the official date of his removal from the USPS.

## II. CONCLUSIONS OF LAW

### A. Family & Medical Leave Act

1. The Family and Medical Leave Act ("FMLA") was passed in 1993 to "help men and women balance the conflicting demands of work and personal life." *See Price v. City of Fort Wayne,* 117 F.3d 1022, 1024 (7th Cir.1997). "It does so by recognizing that there will be times in a person's life when that person is incapable of performing [his or her] work duties for medical reasons." *Id.* The statute includes specific findings about the conditions prompting passage of the act, one of which is that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C.

§ 2601(a)(4). The stated purposes for the legislation are "to balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1), (2). The latter purpose relates to the facts in this case.

2. The relevant portions of the statute include:

**(a)(1) Entitlement to Leave** ... an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12 month period for one or more of the following:

\* \* \*

**(D)** Because of a serious health condition[11] that makes the employee unable to perform the functions of the position of such employee.

\* \* \*

**(b) Leave taken intermittently** ... leave under paragraph (C) or (D) of subsection (a)(1) ... may be taken intermittently or on a reduced leave schedule when medically necessary.

29 U.S.C. § 2612. Employers may require that a request for leave "be supported by a certification issued by the health care provider" of the employee that lists the date the "serious health condition" commenced, its probable duration, and the "appropriate medical facts." 29 U.S.C. § 2613.

3. Once the employee has recovered sufficiently to return from the FMLA leave, he or she "shall be entitled" to be restored to his or her former position, or an "equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a). To enjoy this right, the employee must have been both eligible for FMLA leave, and have taken a leave for

---

**11.** A serious health condition is an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Determining whether an employee's condition qualifies as a serious health condition is a legal question, and the employee must demonstrate the seriousness of his or her condition by a preponderance of the evidence. *See Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 499 (7th Cir.1999).

the "intended purpose of the leave." *Id.* Nothing, however, in § 2614 "shall be construed to entitle any restored employee to ... **(B)** any right, benefit, or position of employment other than the right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3).

4. Unlike anti-discrimination statutes, such as Title VII, the Age Discrimination in Employment Act, and the Americans with Disabilities Act, these provisions of the FMLA primarily grant substantive rights to eligible employees that create entitlements the employer must honor. *See Diaz v. Fort Wayne Foundry,* 131 F.3d 711, 712 (7th Cir.1997). They require an employer to accommodate particular individual circumstances, in contrast to discrimination cases, in which the employer is prohibited from treating one employee worse than another because of something the statute makes irrelevant. *Id.* Laws like the FMLA set "substantive floors," or minimum standards for employment. *Id.; see also Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159, n. 2 (1th Cir.1998) (noting FMLA based on same principle as child labor, minimum wage, and other laws setting minimum standards). Routes' claim that the Postal Service failed to restore him to his former or an equivalent position at the end of his leave comes under this portion of the FMLA.

5. The FMLA is also designed to accomplish its purposes "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3). One way it does so is when it allows an employer to condition an employee's right of restoration on:

a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work, except that nothing in this paragraph shall su-

persede a valid State or local law or a collective bargaining agreement that governs the return to work of such employees.

29 U.S.C. § 2614(a)(4). This passage grants an employer the right to set some conditions governing an employee's return to work from an illness, which right does not supersede a valid collective bargaining agreement that governs such returns to work. An example of a "uniformly applied practice" is when an employer states that any employee absent for a specified number of days must have the required certification before returning to work.

6. The FMLA also contains "anti-discrimination" components, one of which makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful under this subchapter." 29 U.S.C. § 2615(a)(2). Courts have interpreted this portion of the statute to prohibit employers from discriminating against their employees for exercising their rights under the substantive portions of the statute. *See Hodgens,* 144 F.3d at 160. Similarly, the final regulations implementing the FMLA[12] make it clear that an employer may not discriminate against an employee who has used FMLA leave. 29 C.F.R. § 825.220(c); *Hodgens,* 144 F.3d at 160. Nor may employers use the taking of FMLA leave as a "negative factor" in employment actions, such as hiring, promotions, or disciplinary actions. *Id.* Routes' claims regarding Gould's reaction to the leave in December 1994, including his refusal to grant FMLA leave for August 31, 1995, and the wording of the letters asking for a FFDE of Routes, must be analyzed under this portion of the FMLA.

7. The other anti-discrimination component makes it unlawful for an em-

---

12. Those regulations took effect on April 6, 1995, during the course of events leading to this dispute. Congress expressly delegated authority to the Secretary of Labor to issue regulations "necessary to carry out" the FMLA. *Haefling,* 169 F.3d at 498 (citing 29 U.S.C. § 2654). The Court has referred to the final version of the regulations in its analysis of the USPS's conduct following the effective date of the regulations.

ployer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(2). Employers may not defend against a claim of interference with substantive rights on grounds that it treats all employees that way without discriminating. *Hodgens,* 144 F.3d at 159.

■ 8. In sum, the FMLA contains "two categories of broad protections for employees." *King v. Preferred Technical Grp.,* 166 F.3d 887, 891 (7th Cir.1999). First, it contains "prescriptive protections that are expressed as substantive statutory rights," the violation of which need only be proven by showing that the employee was entitled to a specific right and the employer failed to provide it. *Id.; see also Hodgens,* 144 F.3d at 159. "To insure the availability of these guarantees, the FMLA declares it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided.'" *King,* 166 F.3d at 891 (quoting 29 U.S.C. § 2615(a)). The second category protects employees from discrimination or other adverse employment action because they have exercised, or are attempting to exercise, any of the substantive rights. *Id.;* § 2615(b). It is considered essentially "proscriptive in nature." *King,* 166 F.3d at 891 (citing *Hodgens,* 144 F.3d at 160). A claim brought under the proscriptive portions of the FMLA is analyzed similarly to other anti-discrimination statutes. *Id.* at 892.

9. The FMLA provides a means for employees to enforce both their substantive and proscriptive rights under the statute:

(a)(1) Any employer who violates section 2615 of this title shall be liable to any eligible employee affected—

(A) for damages equal to—

(i) the amount of—

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II) . . . any actual monetary losses sustained by the employee as a direct result of the violation. . . .

(ii) the interest on the amount described in clause (I) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (I) and the interest described in clause (ii), except that if an employer . . . proves . . . that the act or omission . . . was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615. . . .

(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C. § 2617.

10. The claims presented by Routes involve both categories of protection under the FMLA. His claim that Gould was angry with him for taking a leave during Christmas of 1994 and treated him differently throughout 1995 as a result, falls under the anti-discrimination provisions of the FMLA. In addition, Routes' claims that Gould refused to restore him to his former position because Routes had taken leave in December of 1994—a type of retaliatory denial of substantive rights—also falls under this provision. The straightforward failure to restore claim falls under the substantive rights provisions.

11. In defense of its actions, the USPS argues that the CBA between itself and the Union incorporates USPS policies governing how an employee such as Routes may return to work after a medical leave for a mental condition. According to the USPS, those policies were followed, and Routes was found to be unfit to return to duty, causing his extended leave that ultimately led to his discharge. For the sake of clarity, the Court will address Routes' claims of a violation of his substantive rights and of the anti-discrimination provisions separately, despite the factual overlap.

## B. Anti–Discrimination Claims

10. As part of its protection to eligible employees, the FMLA provides as follows:

(a)(1) It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

■ 29 U.S.C. § 2615. These provisions encompass a straightforward case of an employer denying an eligible employee the right to take or return from FMLA leave, or an employer interfering with or otherwise hindering an employee from taking or returning from such leave, as well as a case in which leave or restoration are denied in retaliation for the employee having taken a prior leave. The most common way to recover under the anti-discrimination provision is if the employee can make a showing similar to that required for a retaliation case under other anti-discrimination statutes. *See Hodgens,* 144 F.3d at 160. When the employee claims the employer has discriminated or retaliated against him or her for exercising rights granted by the FMLA, the question of intent or motivation is relevant. *King,* 166 F.3d at 891; *Hodgens,* 144 F.3d at 160.

■ 11. For example, a plaintiff alleging a retaliatory discharge under the FMLA "must . . . establish that the employer engaged in intentional discrimination," similar to other retaliatory discharge cases. *King,* 166 F.3d at 892. To prove a case of retaliatory discharge, an employee must show that:

1. the plaintiff availed self of a protected right under the FMLA;

2. the plaintiff was adversely affected by an employment decision;

3. there is a causal connection between the protected activity and the adverse employment action.

■ *Id.; see also Hodgens,* 144 F.3d at 161. The burden is on the plaintiff to prove each of these elements by a preponderance of the evidence.[13] *Diaz,* 131 F.3d at 713.

■ 12. The "causal link" between the protected activity and adverse employment action is demonstrated by showing that the employer would not have taken the adverse action "but for" the employee's protected activity. *King,* 166 F.3d at 892. Evidence of temporal proximity between the protected activity and the adverse employment action is the most common means of proving such discrimination. *Id.* at 893. Statements by a supervisor that reveal animus against the employee for exercising a protected right also suffice to show discrimination. *See Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir. 1996).

13. Routes claims that the USPS interfered with his rights under the FMLA, and that it did so in retaliation for his having taken FMLA-qualifying leave at an inconvenient time for the employer. Specifically, the alleged interference is identified as the USPS refusing to restore Routes to his former position after his 1995 FMLA leave, subjecting him to an unauthorized FFDE, tainting the FFDE process leading to an outcome adverse to him, ignoring his further attempts to return to work, and leaving him on LWOP status long enough that he was subject to termination under USPS rules.

14. The USPS denies it interfered with the exercise of any of Routes' rights under the FMLA, either outright or in retaliation for past exercise of those rights. It first argues that Routes has failed to prove that his December 1994 absence was an

---

13. Were this a summary judgment decision, the Court would be authorized to consider the proffered evidence using the burden-shifting analysis common to other anti-discrimination cases. *See King,* 166 F.3d at 892–93 (extending the full *McDonnell–Douglas* framework to FMLA anti-discrimination cases).

FMLA-protected leave. In support of this argument, the USPS reminds the Court that Routes testified that he took paid sick leave and did not ask for FMLA leave. Moreover, Gould testified that he was not told that Routes wanted FMLA leave, and plaintiff's counsel presented no written documentation that the December 1994 leave was ever designated as FMLA leave.

15. If these factors constituted the test for whether an absence caused by a serious health condition qualified for FMLA protection, that protection could be reduced by actions of the employer who would have an incentive to keep employees ignorant of their rights and to refrain from designating a qualifying absence as FMLA leave. The Court does not accept these facts as the measure of whether the December 1994 leave was FMLA-qualified. The statute does not contemplate allowing employers to benefit from their employee's lack of knowledge about their FMLA rights. *See* 29 U.S.C. § 2619 (requiring employers to post notices of FMLA rights and authorizing a civil money penalty against employers who "wilfully violate" the notice requirements).

■ 16. Instead, when an employee who is eligible for FMLA leave notifies his or her employer of the need to take leave for a qualifying reason, the FMLA places the risk of ignorance on the employer. *See Stoops v. One Call Comm., Inc.*, 141 F.3d 309, 312 (7th Cir.1998) (employee need not mention, and may be ignorant of, the FMLA, yet be protected as long as enough information is given to put employer on notice that FMLA-qualifying leave is needed); *Price*, 117 F.3d at 1025–26 (employee's request for paid sick leave put employer on notice that leave was possibly

FMLA-protected); *see also Viereck v. City of Gloucester*, 961 F.Supp. 703, 707 (D.N.J. 1997) (employee who told employer she was hospitalized and would be off work for some time put employer on notice of a serious health condition).

17. If the employee is eligible for FMLA leave and provides notification to the employer, it is the employer's duty to investigate to see whether the FMLA applies, and to notify the employee of its application. *Price*, 117 F.3d at 1026 (citing 29 C.F.R. §§ 825.303(b), 825.208(a)). If the employer fails to notify the employee of applicability of the FMLA to the employee's medical leave, the employee is left without important information by which to structure the leave. *See Mora v. Chem–Tronics, Inc.*, 16 F.Supp.2d 1192, 1228–29 (S.D.Cal.1998) (suggesting employee can be discouraged from taking leave when employee does not know absence would be covered under FMLA); 29 C.F.R. § 825.208(b)(1) (requiring employer to "promptly" give employee notice that paid leave is designated as FMLA leave). That ignorance may also interfere with the employee taking leave at all in certain circumstances, such as when a spouse or child suffers a serious health condition and is in need of care. *Mora*, 16 F.Supp.2d at 1229; *Williams v. Shenango, Inc.*, 986 F.Supp. 309, 320–21 (W.D.Pa.1997).

■ 18. The Court finds that Routes did not have to specifically ask for FMLA leave in December 1994, in order for the sick leave he took at that time to qualify as FMLA leave.[14] This is especially true when the evidence shows that no notices or information about the FMLA were available in Routes' workplace prior to this

---

**14.** Although not raised by the USPS, the Court notes that Routes' leave in December 1994 was apparently foreseeable, subjecting him to the thirty-day notice requirement for foreseeable leave. 29 U.S.C. § 2612(a)(2). The statute places on employees the duty to "make a reasonable effort to schedule treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee

... as appropriate." This statutory provision could have been invoked by Gould asking whether Routes' health care provider would approve re-scheduling the leave "so as not to unduly disrupt" post office operations. Nevertheless, because the USPS had not posted any notices regarding employees' rights and duties under the FMLA, the Court could not find under these circumstances that Routes violated this provision.

leave. When Routes notified Gould that he needed time off from work to be treated for his severe headaches on an inpatient basis at a hospital, he supplied sufficient notice to his employer that his leave might qualify for FMLA-protection. At that time, Gould was obligated to investigate further to determine if the FMLA was applicable. He did not do so.

19. The Court has already found that Routes satisfied the eligibility requirements for FMLA leave in December of 1994, and that he was absent from work because of a serious health condition. It now finds that the leave Routes took should have been designated by his employer as FMLA leave, and that any hindrance of, or repercussions for, taking that leave may be considered interfering with or restraining his rights under the FMLA, or retaliation.

■ 20. The USPS also argues that Routes failed to produce sufficient evidence for the Court to find that Gould actually restrained or interfered with the exercise of FMLA rights by Routes, or retaliated against him for such exercise. It bases this argument on the contention that Routes is not a credible witness, especially about events surrounding the December 1994 leave. The Court has already found that Routes reasonably understood Gould to have communicated in December of 1994 that Routes' job was in jeopardy because he took sick leave at a busy time of the year and that it would be further endangered by any subsequent absences. In addition, Gould admitted he tried to get Routes to change his sick leave until after the holidays and became upset when Routes refused. At no time did Gould inquire about whether Routes' health care provider might approve such a change, as allowed by the FMLA for foreseeable leaves. Instead, Gould's actions constituted attempts to restrain or interfere with

the exercise of Routes' rights under the FMLA in December 1994. They also signaled the beginning of Gould's negative reaction to the taking of this leave.

21. With respect to Routes' credibility, the Court recognizes that Routes was forced to admit while testifying that he had lied to others. He admitted lying to his wife, his AA counselor and his doctors about his covert drinking. Similarly, he admitted that he denied on a USPS Physical Fitness Inquiry Form that he had any alcohol drinking problem. Ex. 50. The form was signed by both Routes and Gould on October 15, 1993, at which time Routes had already been diagnosed with alcohol-induced pancreatitis and been arrested for DUI, about which Gould was well aware.[15] More significant for purposes of the proceedings in this case, however, is the subject matter of Routes' lies. He lied to prevent people who were close to him from knowing that he continued to drink. At no time did the evidence reveal Routes to have lied with respect to any material fact in this case. Gould, on the other hand, was found to have exaggerated and misrepresented some of the facts contained in letters he wrote, and made inconsistent statements during the course of the trial. Those credibility problems go to the heart of the matter in dispute and have a more direct impact on the fact-finding in this case.

22. The Court does not mean to accuse Gould of deliberately lying. Rather, it appears that Gould had a negative, if understandable, reaction to Routes taking sick leave in December of 1994, when the small post office could least afford to be short-handed. That reaction, however, is prohibited by the FMLA from coloring or otherwise affecting any subsequent decisions Gould made about handling this employee or dealing with his continuing medical problems. From the evidence

---

**15.** Since Gould was aware of the fact that Routes had a drinking problem when he signed this form as the "examining personnel," he is vulnerable to a similar credibility attack. No evidence was presented, however,

about whether the form had been completed by Routes when Gould signed it, making this a less definitive example of Gould's credibility.

presented, the Court finds that Gould did allow his negative reaction to affect his subsequent conduct. Whether Gould felt that Routes was an employee whose absenteeism was not good for the post office as a whole, or he just developed a negative filter through which to process all incoming information about Routes, it created a subjective reality in which Routes' past conduct and present condition were interpreted in the most negative light. Even if Gould's reaction is understandable, it is the Court's view that his conduct is inconsistent with the FMLA.

23. The USPS also attacks Routes' credibility by pointing out that Gould was not allowed to deny any sick leave requests, leaving Routes' alleged fear of missing any more work without a basis in fact. No evidence was produced, however, that Routes had any knowledge that Gould did not have the power to deny sick leave. Besides, what Routes apparently feared was an adverse employment action against him if he took any more leave. Given the implicit threat in Gould's statement that "I don't need employees like [you] who schedule themselves off" for elective medical treatment at the busiest time of year, Routes' fears appear to have been warranted, even if Gould had no actual authority to carry out his threat. Consequently, the statement by and subsequent activity of Gould had a "chilling" effect on Routes with respect to taking any additional sick leave—even for a serious health condition like major depression or, possibly, a broken knee. *See Williams,* 986 F.Supp. at 321; *see also Mora,* 16 F.Supp.2d at 1228–29. That chilling effect constitutes a prohibited act under the FMLA.

24. Finally, the USPS points out that Gould did approve the December 1994 leave and a reduced work schedule when Routes returned, even without medical certification, and argues this proves that Gould did not retaliate against Routes. It also argues that all employees worked additional hours in 1995 in connection with opening the new post office, and Routes was treated no differently than the others. Since the USPS also contends that Gould could not deny sick leave, the fact that he approved Routes' 1994 leave does not prove the absence of retaliatory animus. Nor did the evidence show that other workers were scheduled for additional hours in January, February and March of 1995 as a result of opening a new post office. Instead, the additional hours seemed to be more concentrated around the late spring and early summer months of 1995. The evidence shows that Routes was immediately scheduled to work numerous consecutive seven-day work weeks as soon as he returned from his leave and reduced work schedule. Ex. A. It also shows a dramatic increase in the number of six and seven-day work weeks assigned to Routes after the 1994 leave, from 56% in the period immediately preceding his 1994 leave to 83% in the period immediately following it.

25. Other evidence that Gould harbored discriminatory animus toward Routes as a result of the 1994 leave includes the fact that he sought official disciplinary action against Routes for having taken that leave, as well as other absences that Gould knew were caused by Routes' severe headaches. Similarly, Gould issued a written disciplinary discussion for an incident that had occurred six weeks earlier, and for which he had already disciplined Routes. In addition to these actions, which were taken immediately after Routes returned from the 1994 leave, the evidence shows Gould continued to have his perception of events colored by his negative opinion of Routes for having taken the 1994 sick leave.

26. That evidence includes the fact that Gould listed Routes as AWOL on August 31, 1995, even though he heard from Routes' wife in afternoon of that day that Routes was in a hospital and would be absent from work due to his illness. This telephone call put Gould on notice that Routes' absence that day probably would qualify for FMLA protection. Furthermore, Gould received a notice from Routes' treating physician the next day that indi-

cated Routes had been admitted to the hospital on August 31, 1995, and he would be absent for a week or two. Therefore, by September 1, 1995, Gould had every reason to believe Routes' absence on August 31, 1995, was for a FMLA-qualifying purpose, and that it should be designated FMLA leave. Yet, Gould refused to so designate that day as part of Routes' protected leave. This action was significant both because it demonstrated Gould's continuing intent to "punish" Routes for being unavailable during the 1994 busy time, and also because it represented a new restraint or interference with Routes' FMLA rights.

27. Gould testified that he was keeping his options open regarding Routes' AWOL status on August 31, 1995, and the evidence supports that statement. Gould used the AWOL status to support a request for official disciplinary action against Routes, to justify the first FFDE request, and to seek Routes' termination in November of 1995. *See* Ex. 14, Letter dated Aug. 31, 1995; Ex. 18, Letter dated Sept. 12, 1995; Ex. 29, Letter Dated Nov. 22, 1995. The letter to Labor Relations seeking disciplinary action against Routes connected this absence with the December 1994 sick leave, for which Gould claimed he had given Routes a "disciplinary discussion," and demonstrated the source of Gould's immediate negative reaction to Routes' unscheduled absence. Ex. 14. He specifically asked for the "maximum appropriate disciplinary action available" against Routes for the August 31, 1995, absence.[16] *Id.* Each time Gould used the AWOL status against Routes, it reflected a negative attitude toward, and perhaps an intent to punish, Routes for his absences—both in December of 1994 and on August 31, 1995.

28. Other evidence that Gould's perceptions were affected by his negative reaction to the 1994 leave consists of Gould's

decision to seek a FFDE of Routes before he could return from his FMLA leave, and the content of the two letters requesting such an evaluation. Gould explained his decision to seek a FFDE for Routes in several different ways. At one point he said it was automatic whenever an employee is hospitalized for a mental condition. In support of this the USPS cites provisions in its Personnel Operations Handbook, EL–311 ("Handbook") and its Employee and Labor Relations Manual ("Manual"). *See* Ex. 47, Def's Ex. 2. One provision of the Handbook states that employees returning to duty after an absence for a mental condition, or following hospitalization, must submit a "physician's statement stating unequivocally that they are fit for full duties without hazard to themselves or others, or indicating the duties which they are capable of performing." *Id.,* Handbook, § 342.2. It further states that the USPS medical officer must approve the physician's release. *Id.* This provision does not automatically require a FFDE, nor does it even mention one. According to the USPS, Dr. Wenzler's release did not comport with the § 342.2 requirement as it limited Routes to working five days a week, and Routes' position required him to be available to work seven days a week. Presumably this argument suggests that Dr. Wenzler's release was equivocal. The USPS also cites another Handbook provision, which directs a FFDE if an "employee claims inability to perform the full duties of the position." *Id.,* Handbook, § 342.52. Again the USPS contends that Routes attempted to return to work limited to working only five days a week. Finally, a provision in the Manual states that when the reason for a sick leave "is of such a nature as to raise justifiable doubt concerning the employee's ability to satisfactorily and/or safely per-

---

16. The fact that Gould did not follow through with his initial request for discipline by providing Labor Relations with additional documentation does not negate the inference to be drawn from his having sought discipline against an employee for protected activity. While it does not constitute adverse *employment* action, the requests for discipline certainly demonstrate Gould's attitude and feelings toward Routes as a result of his having taken sick leave.

form duties," a FFDE is requested. Def's Ex. 2, Manual, § 513.38.

29. The difficulty with relying on these provisions is that Gould stated at trial that he did not consider Routes to be restricted by his physician to light or limited duty, and that he received a full release for Routes to return to work from Dr. Kelly, who was the treating physician during Routes' last hospitalization. Routes concurred with this testimony. In addition, Gould admitted that Routes did not claim to be unable to work seven days a week. The Court is reluctant to allow the USPS to justify a FFDE of Routes based on these provisions, when its own witness testified to facts that do not meet the criteria for invoking these rules. Moreover, as will be further discussed below, these provisions do not supplant an employee's right of restoration to his or her former position upon return from FMLA leave. Gould also said he ordered a FFDE because of what Routes was hospitalized for, presumably invoking the provision in the Manual about the nature of the sick leave raising a doubt about an employee's ability to perform. Yet, by his own admission, Gould contacted Labor Relations regarding a FFDE even before he had any idea why Routes was hospitalized. Based on the evidence presented at trial, the Court is persuaded that the provisions cited by the USPS as authorizing the FFDE of Routes before he would be allowed to return from his FMLA leave do not support that action. The other reasons Gould gave for seeking a FFDE were contained in his actual request letters, to which the Court now turns.

30. Even if Gould were justified in seeking a FFDE of Routes, both of his request letters contained misinformation, exaggerations and misrepresentations. In the first letter, dated September 12, 1995, Gould stated that he wanted a FFDE evaluation of Routes because he was hospitalized for suicidal "tendencies," when the doctor had written suicidal "ideation." The distinction is significant, because Dr. Patel picked up Gould's term and used it in her communications with Dr. Country-

man, who provided the psychiatric evaluation. Gould testified that he concluded from Dr. Wenzler's letter of September 8, 1995, that Routes posed a risk to others because he had demonstrated he was capable of violence. Yet, there was no mention of any attempt at suicide in Dr. Wenzler's letter, nor does the USPS cite any evidence that would support Gould's conclusion about Routes' propensity for violence, other than this letter. It is the Court's view that Gould's interpretation of Dr. Wenzler's letter was filtered through a lens bent on portraying Routes in the most negative light.

31. The USPS relies on Gould's descriptions of Routes' behavior in the workplace and the conclusions he drew from combining the fact that Routes was hospitalized for depression and alcoholism, with events that had allegedly occurred over a ten year period of time, to support the decision to order a FFDE. That reliance is misplaced, as further explained below. In the first letter requesting a FFDE, Gould wrote that disciplinary action was pending against Routes for being AWOL on August 31, 1995, when in fact Gould did not respond to Labor Relations' request for additional documentation. Nor does it appear he intended to respond, given Gould's trial testimony that he had requested discipline before he knew Routes was hospitalized on August 31, 1995. That statement suggests he would not pursue disciplinary action under these circumstances. As the Court has found, Routes was not AWOL on that date, he had been admitted to the hospital and his absence was therefore part of his FMLA leave. Gould's representation on September 12, 1995, that Routes was AWOL was a misrepresentation of the facts. Additionally, it was an example of holding the taking of leave as a negative factor against Routes, which is a violation of the FMLA. *See* 29 C.F.R. § 825.220(c); *Hodgens,* 144 F.3d at 160.

32. Gould also wrote that "throughout Routes' work history" he exhibited "severe and unpredictable behavioral patterns,"

and he gave as an example the fact that "several years ago" Routes "threatened to burn [Gould's] house down." At trial, Gould testified that Routes made that statement five to ten years prior to the date of the FFDE request, and that Gould did not discipline Routes at the time because he did not take it as a threat.[17] It is significant that Gould used an event that occurred sometime between 1985 and 1990—more than "several years ago"—in his letter asking for a psychiatric evaluation of an employee's fitness for duty in 1995. Given the absence of any subsequent conduct by Routes that demonstrated a willingness to follow through with that threat, Gould's opinion that it was relevant to determining whether Routes was fit for duty is suspect.

33. Another accusation Gould aimed at Routes in this letter was that he was taking very strong medications from "at least four different doctors" at the same time. Ex. 18. At trial Gould could not substantiate this allegation, and merely stated he took Routes' word for the fact he was on strong medication. He also said he did not know how many doctors Routes had. There was no evidence that Routes was taking medicine prescribed by at least four doctors.[18] The FFDE letter also referred to Routes' trouble with migraine headaches in the past and that he had been hospitalized twice in the previous eighteen months for treatment of headaches. The health conditions for which the FFDE was sought, however, were depression and alcoholism, not migraines, making it unclear why Gould thought it necessary to include this information. He had no basis for questioning Routes' fitness for duty because of headaches at that time. A reasonable inference is that Gould was augmenting his record in support of challenging Routes' fitness for duty.

34. Finally, Gould stated that "over the years" he had given Routes two disciplinary discussions and two letters of warning for his "tempermental verbal explosions" directed at fellow employees. After admitting that no letters of warning had ever been given to Routes for such conduct, Gould testified that he purged Routes' disciplinary file in 1990 and "there may have been something" in there, he just was not sure. The only "disciplinary discussion" that Gould could identify in support of his statement that he had issued formal and informal discipline to Routes for verbal explosions, stated that

> Your approach to offering corrective or training information or criticism of activities by fellow employees is often laced with derogatory or demeaning verbiage, especially to female employees, which not only often results in emotional responses by the employees but inhibits a pleasant working environment for the entire office. I understand that your normal voice sometimes sounds harsh and raspy, but if you cannot offer assistance or advice to fellow employees in a constructive manner, you must refrain from commenting at all and simply refer the problem to me for me to solve. The fact that a comment from you has caused a fellow employee to cry should be an indication that you have overstepped your bounds and will be subject to further disciplinary action from me. I expect you to address fellow employees in a sensitive, caring manner or to not converse at all.

Ex. 7, Memo. Dated June 20, 1994. If the conduct to which this memorandum re-

---

17. Given Gould's testimony that the USPS has always had a "zero-tolerance" for workplace violence, it is odd that Gould would allow an employee to make a genuine threat like this without repercussion. It is more likely that the statement only became a threat in Gould's mind after it went through the negative filter.

18. Instead, the evidence showed that in 1991 Routes was taking a prescription for Vicodan, a strong pain medication, from two different doctors, until one of them found out and discontinued prescribing it. Not only would this incident be of questionable relevance at the time Gould sought a FFDE, but he did not mention it as being the source of his statement about strong medications.

ferred had in fact been a "tempermental verbal explosion," it is puzzling that the memorandum provides so little insight into that fact. There were no other disciplinary discussions recorded for any type of verbal "abuse" or "explosions" at co-workers. The Court finds that this accusation about disciplinary discussions in the FFDE request was another embellishment of the record that reflects Gould's subjective views of past events.

35. More troublesome, however, is the fact that Gould wrote that he had given Routes two "disciplinary warnings" for such conduct, yet he admitted at trial that there were no such warnings. Gould's propensity to embellish Routes' disciplinary history for purposes of his challenge of Routes' fitness for duty, further demonstrates the effect of his negative reaction to the 1994 leave. At trial, Gould rationalized his conduct by stating he did not refer to his records when writing this letter, but any inaccuracies were "superficial." Given that Gould was initiating a process that could lead to an employee losing his job, the Court finds that his attitude towards its accuracy reflected his own negativism toward Routes. Secondly, the Court finds that the inaccuracies were not superficial.

36. The most potent of accusations in the first FFDE request letter is Gould's statement that he considered Routes "to be a threat to this office and himself," given his "history of unpredictable and violent outbursts." First, Gould admitted that he thought three undocumented incidents of yelling at co-workers, none of which resulted in any discipline, and one incident that resulted in lukewarm discipline, constituted a history. Second, there was no evidence that Routes' behavior in the workplace during the several years preceding the FFDE request, was ever violent. This is another example of Gould including in the request letter facts that were filtered through his own negative perception of Routes, and that signaled the expected outcome of the FFDE.

37. This letter was sent to Morrison, who was the final decision-maker with re-spect to Routes' termination. It was also sent to Dr. Patel, who was responsible for deciding if Routes was fit for duty, and to Dr. Countryman, who conducted the psychiatric evaluation of Routes for Dr. Patel. The evidence also indicates it was sent by Morrison to the director of Human Resources at the USPS office in Indianapolis. Ex. 19.

38. On October 19, 1994, after getting another "release" for Routes to return to work and after Routes had called Gould and asked to return, Gould sent a second letter directly to Dr. Patel asking for a FFDE. At trial, Gould stated that he sent this second request because Routes had asked to return to work and Gould had not yet received a FFDE report from Dr. Patel. In the letter itself, however, Gould told a different story about why he was asking again for a FFDE. He wrote, "I had previously submitted a request for a fitness-for-duty and when you called me we decided to wait until [Routes] was prepared to return to duty before acting. He has expressed a desire to return to duty as soon as possible." Ex. 25, Letter dated Oct. 9, 1995. This inconsistency indicates that Gould may have had a different reason altogether for writing a second time.

39. That inference is born out when reviewing the second letter, which contains many of the same exaggerated statements as the first letter. In this letter, however, Gould referred to Routes' "extended absence" for treatment of "suicidal tendencies and drug/alcohol rehabilitation," although he admitted at trial that the absence was being forced on Routes. (Gould would not let Routes return to work until Dr. Patel authorized it.) Nor did Gould have any evidence that Routes was being treated for drug rehabilitation, other than his own interpretation of the medical report from Fairbanks Hospital. The second letter further adorned the previous descriptions of Routes' conduct. For example, Gould wrote that over the years Routes had "unpredictably exploded verbally" at Gould and at fellow employees

in "fits of rage." At trial, Gould did not provide any additional examples of these "explosions" other than the three for which no documentation exists, and the specifics of which he could not recall. Nor did he provide any specific descriptions of, or documentation about, any "fits of rage." The Court finds these further embellishments to be a reflection of Gould's negative attitude toward Routes.

40. Gould also stated in the second letter that he had taken "disciplinary action many times" against Routes for his violent behavior, but "given the broad time frame" Routes had "never gotten more than a letter of warning." As noted previously, Gould admitted there were no letters of warning in Routes' personnel filed regarding violent outbursts, and this statement is a misrepresentation of the facts. Moreover, not only was there no documentary evidence that Gould took disciplinary action against Routes "many times" for his alleged fits of rage, Gould admitted at trial that "disciplinary action" may have been the wrong choice of words. Although Gould acknowledged that disciplinary action had a specific meaning in the progressive discipline system, he explained that he considered disciplinary discussions to be "disciplinary action" for purposes of this letter. There was no evidence, however, of any disciplinary discussions for fits of rage.

41. Also in the second letter, Gould wrote that Routes had requested a five-day work week, even though at trial he admitted that Routes had never asked for that. At one point Gould explained that he read that restriction in Dr. Wenzler's letter. Yet, he had testified earlier in the trial that he did not consider Dr. Wenzler's letter to be a request for restricted or light duty, or for an accommodation. Aside from that, the second FFDE request followed a full release from Dr. Kelly for Routes to return to work with no restrictions, which Gould admitted. Unable to reconcile these inconsistencies, Gould finally testified that there was "quite a bit of confusion" over Routes' restrictions. Despite the confusion, Gould decided to tell Dr. Patel on October 19, 1995, that Routes had requested a five-day work week.

42. On a related note, Gould speculated in this second letter that Routes found it stressful to use the computerized equipment and stated that if true, Gould had no light duty work available for Routes. More than two weeks earlier, however, Gould had already told Routes that he had no light duty positions available at the Nashville post office and that he would never have any. Moreover, during his testimony while the Rehabilitation Act claim was still pending, Gould stated that Routes did not ask for a light duty assignment. A natural inference to be drawn from all of these inconsistencies is that Gould's recollection of the facts told a story that best fit with the outcome he wanted to achieve.

43. Finally, Gould connected a Violence in the Workplace seminar he had just attended with his concerns about Routes' "violent temper, suicidal tendencies" and the fact that Routes blamed Gould's disciplinary discussion in December 1994 with aggravating his depression. He specifically asked Dr. Patel, for guidance on "how to quickly take disciplinary action if needed or remove the employee from the office." Ex. 25. He wrote that he was "very concerned about this employee's mental stability" and the "safety of myself and all of the employees in this office, most of whom he has verbally attacked at one time or another." *Id.* Given the paucity of evidence supporting Gould's interpretation of the threat posed by Routes, and in light of Gould's obvious negative attitude toward this employee, these statements further demonstrate Gould's tendency to exaggerate the danger.

44. Another decision made by Gould that reflected his negative attitude toward Routes as a result of the 1994 sick leave occurred when he wrote to Labor Relations to start the process for Routes' termination. To justify this request, Gould wrote that Routes was AWOL on August 31, 1995, and that he had not returned to work since then. At trial, Gould defended

his action in writing this by claiming that Routes was not protected from discipline for this absence because he "had not advised me that he had been admitted on the 31st." However, the parties' stipulated exhibits show that Gould had been informed of Routes' hospitalization on the day it happened, and he even admitted that Routes' wife called him that day to tell him Routes was in the hospital. Not only is this testimony inconsistent, it also represents a post-event rationalization of Gould's conduct. At some level, Gould was aware that he should not have used the alleged AWOL status against Routes, but he put it in the letter requesting termination anyway and tried to rationalize it at trial. The Court finds this letter further evidence of Gould's negative attitude toward Routes in connection with his medical condition and his need for sick leave.

45. The termination request also stated that Routes had been absent since the AWOL, and the reason was treatment for "alcoholism/drug abuse" and major depression resulting in "suicidal tendencies." Certain words can be especially inflammatory for employers and Gould managed to use most of them in this memorandum. He cited Routes' "history of violent outbursts in the workplace," which the Court has already found to be an exaggeration, if not a complete misrepresentation.[19] He also said Routes had been given a psychiatric FFDE, and that Routes' psychiatrist had released Routes to work "under restrictions that he could not work over five days per week for an indefinite period of time (light duty) due to job stress." The latter statement has already been shown to be untrue, and the fact that Gould included it in this letter renders his motives for writing the letter suspicious.

46. Indicating that he had no light duty positions in Nashville, and that he had not yet heard from Dr. Patel, Gould stated that "at about $600 per [psychiatric] ses-

sion, the postal service could spend a considerable amount of money with inconclusive information" about Routes being able to return without risk to himself or others. He suggested that they terminate Routes rather than spend any more money on psychological evaluations. Noting that Routes was still on FMLA leave, Gould described his letter as an attempt to get the process started to have Routes "separated as soon as possible after his 120–day period expires." Finally, Gould concluded that "Postal Inspector Pat Sheehan is also involved," in Routes' "case because of our concern over the employee's violent history." Ex. 29. Given that Inspector Sheehan had investigated Routes, found no evidence of any incidents of violence, and told Gould so in early October, this statement in late November can only be construed as a misrepresentation of the facts.

47. Subsequent adverse decisions and actions taken by Gould include the fact that he continued to refuse to allow Routes to return to work, despite his additional requests to do so. In January of 1996, Gould signed a letter giving Routes the options of resigning, retiring or taking permanent light duty status, to which Routes responded that he wanted to return to work in accordance with his medical release. Gould ignored that request, even though Dr. Patel's note had indicated that Routes was not fit for duty "at this time." Sometime in July of 1996, Gould was sent a letter from Dr. Wenzler again indicating that Routes was able to return to work. Although Gould testified he did not recall receiving this letter, the Court finds that his testimony does not disprove the fact that it was sent to him and it provided notice of Routes' continuing desire to return to work. Finally, in early 1997, Gould initiated the process of having Routes separated from employment with the USPS. Ex. 36. All of these decisions had an

19. Given that the USPS has a policy of zero-tolerance of violent conduct in the work place, it is curious that Gould never disciplined Routes for this "long history of violent outbursts in the workplace." That fact leads to an inference that Gould is either exaggerating or fabricating the alleged history. Either way, it is not an objective view of Routes' work place behavior.

adverse affect on Routes' employment relationship.

48. Having found that Routes engaged in protected activity—he took leave in 1994 that qualified for FMLA protection and he attempted to exercise his right to be restored to his former position following FMLA leave in 1995—and that his employer, through Gould, took adverse actions against Routes following that protected activity, the Court now turns to a determination of whether there is a causal connection between the two. It is apparent that Gould acquired a negative attitude toward Routes' continued employment at the USPS because of the leave Routes took in December of 1994, at a time when the post office was at its busiest. He expressed that attitude to Routes shortly after he returned from the leave, causing Routes to refrain from taking any additional leave during 1995 until he broke his knee in July and was hospitalized for depression on the last day of August. The fact that Routes took no other leave in 1995 is evidence of the adverse effect of Gould's expression of his negative attitude toward Routes in December 1994. Gould's attitude also caused him to view any additional absences by Routes in a negative light, it affected his ability to objectively evaluate the information he received about Routes in September and October of 1995, it influenced his decision to seek the FFDE, and it affected how he reported Routes' workplace conduct. When Gould sought a FFDE of Routes before he could return to work, he denied Routes his substantive right of restoration under the FMLA. The evidence adequately supports a finding of a causal link between Routes' protected activity and Gould's decisions that adversely affected Routes.

49. The evidence also demonstrates a link between Gould's negative attitude towards Routes and the decision that Routes was not fit for duty, which decision led ultimately to Routes' termination. Gould's letters containing the noted exaggerations and misrepresentations were sent to Dr. Patel, the USPS medical officer responsible for determining whether Routes was fit to return to work. The evidence is clear that they had an effect on her ultimate decision. Dr. Patel's duty as a medical officer was to determine whether Routes was capable of performing the essential functions of his job at the post office without endangering himself or others. In performing that duty, Dr. Patel did not contact Routes or any of his treating physicians. She testified that she believed what Gould wrote about Routes' behavior in the workplace, and his opinion that Routes posed a threat to himself and others, that he was mentally unstable, and that he had suicidal tendencies. Because she is not a psychiatrist or psychologist, Dr. Patel referred Routes to Dr. Countryman for a psychiatric evaluation.

50. In her letter of referral, Dr. Patel told Dr. Countryman that Routes was absent from work for "suicidal tendencies" and "drug/alcohol rehabilitation" and that the "postmaster is reluctant to let him come back to work because of his past violent and threatening behavior with his supervisors and coworkers." Ex. 27. She also said she was "enclosing the letters from the postmaster, indicating his concerns and his questions." *Id.* Consequently, the letters from Gould that contained misrepresentations and exaggerations were forwarded to the "independent" psychiatrist who was asked to perform a psychiatric evaluation of Routes. After spending an hour with Routes, Dr. Countryman referred him to Dr. Ward for psychological testing, and then wrote his final report, in which he recommended medical retirement. Dr. Ward's report was neutral as it relates to whether Routes posed any threat to himself or others in the workplace. In fact, at no point did she say whether Routes was dangerous, could become violent, or even incapable of performing his duties at work. Instead, she reported that the tests indicated Routes had an impulse control problem and he was very depressed. She also reported numerous positive indicators for recovery.

51. From that report, Dr. Countryman concluded that Routes was "definitely depressed" and he had not sufficiently recovered to return to work. Ex. 46. Contrary to the explicit directions in the USPS authorization form letter, Dr. Countryman did not provide a "well reasoned opinion as to the factors" that make Routes unable to return to work. Revealing the influence of Gould's letters on his decision, Dr. Countryman then stated that "because of the long term chronicity and severity" of Routes' problems, he thought Routes should be retired. There was nothing in Dr. Ward's tests or Dr. Countryman's earlier report that indicated a "long-term chronicity" of Routes' condition. Instead, that notion seems to have been gleaned from Gould's descriptions of the "long history" of violent outbursts in the workplace.

52. Dr. Countryman's opinion did not provide Dr. Patel with the necessary information on which to base an objective evaluation of Routes' ability to return to work. Dr. Countryman did not provide a detailed description of the specific work factors contributing to Routes' mental condition, or give a mental status diagnosis according to the DSM–IV, nor did his report contain a "well reasoned opinion as to the factors of employment that caused, aggravated, precipitated or accelerated the presenting condition." *See* Ex. 28. It also did not have a "duty status recommendation which includes any limitations of the ability of this individual to take supervision, cooperate with others, return to the same work site, and/or work with the same supervisor." *Id.* Finally, Dr. Countryman did not opine on whether Routes was "capable of violence" or whether he "presents a danger to himself or others." *See id.* Each of these issues was listed in the psychiatric evaluation authorization form letter.

53. Dr. Patel described this form letter as providing "guidelines on what kind of issues we want the doctor to address in the evaluation." According to Dr. Patel, Dr. Countryman addressed most of them. She also testified that she did a background investigation about whether Routes presented threatening or violent behavior, but admitted it consisted of talking with Gould and reading his letters. She said she forwarded Gould's letters to Dr. Countryman because Gould worked with Routes every day, and if he felt threatened by him, Dr. Countryman should know it. She testified that she did not contact Dr. Wenzler to confirm the purpose of his treatment of Routes, but stated she thought it was for alcohol or drug abuse.

54. The Court cannot agree with Dr. Patel's assessment of Dr. Countryman's report. It is apparent that Dr. Countryman merely addressed the ultimate, administrative, decision of what to do with Routes. He stated that Routes was not ready to be returned to work and he recommended medical retirement, without making any findings as to Routes' dangerousness, his prognosis, or his present condition. This is the decision Dr. Patel was supposed to make, based on objective medical evaluations from doctors with expertise in psychiatry and psychology. Although Dr. Patel admitted she had no expertise in these areas, she defended her decision that Routes was not fit for duty by stating the psychological tests showed he was dangerous. Neither Dr. Ward nor Dr. Countryman made that finding, and both have expertise in the field and reviewed the tests.

55. Dr. Patel admitted at trial that Dr. Countryman did not say Routes was a danger in the workplace, but she defended her conclusion with the test results that indicated Routes was prone to acting out against himself or others. She understood this to mean violent acts, and admitted she based that conclusion on the term "verbal explosions" found in Gould's letters. She also focused on the term "security threats" and "denial and covering up" behaviors, and testified that she understood these to mean Routes posed a danger. She acknowledged that Dr. Ward had said that "given the low base rate of acting out behaviors," which she understood to mean that Routes had not acted violently so far, it was "virtually impossible" to make a

"highly accurate prediction" about Routes' propensity for violence. Dr. Patel also agreed that Dr. Ward could not make a prediction either way. It appears that Dr. Patel added Dr. Ward's "low base rate" to Gould's letters and concluded that Routes really did pose a risk of violence. In other words, she filled gaps in the medical reports with information about Routes' workplace behavior gained only from Gould.

56. Dr. Patel testified that both Dr. Countryman and Dr. Ward had said Routes showed numerous positive indicators for recovery, and she did not disagree with them, nor did she independently investigate whether Routes was in fact doing what he told Dr. Countryman he was doing (IOP, AA meetings, medications, seeing Dr. Wenzler). Nevertheless, a few days later she issued a three-sentence report to Gould saying that Routes was not fit for duty at this time, without mentioning any positive indicators, and instead writing that his prognosis was poor. At trial she said this was "because of the long-term chronic problems he had and the severity of the problems." Again, this information came only from Gould's letters.

57. According to Dr. Patel, she checked with Gould to see if Routes had to work seven days a week, and Gould said he did. Gould, however, testified at trial that he did not tell Dr. Patel Routes was required to work seven days a week. At no time did Dr. Patel talk to Routes, nor did she ask for documentation from his physicians—she said she believed Gould. Dr. Patel testified that she may have contacted Dr. Ward to see why she thought there were numerous positive indicators, and Dr. Ward said it was a good indication that Routes was doing all the right things to get better. Dr. Patel agreed with this opinion. Thus, it is unclear why she wrote that Routes had a poor prognosis for recovery. Although Dr. Patel said at trial that it was not important that Dr. Ward found numerous positive indicators for recovery, during her deposition she had said it was important because it showed Routes might recover and come back to work and "not be a threat to anyone."

58. After she made her initial finding that Routes was not fit for duty, Dr. Patel did not contact Routes or his doctors to determine when he might be ready to return to work. She acknowledged that she probably saw the release from Dr. Wenzler dated December 14, 1995, but she did not contact either the doctor or Routes in response. She did not recall why. She also admitted that the July 25, 1996, letter from Dr. Wenzler was in Routes' medical file, which contradicts Gould's testimony that he did not recall receiving it. Dr. Patel did not follow-up on Routes' condition after her initial finding that he was not fit for duty, explaining that she has too much work to do to follow up with all the employees she evaluates. Instead, once she gives her report to the postmaster she considers her job completed, unless the postmaster, the employee, or lawyers, contact her. Gould never contacted her again after her report.

59. Dr. Patel said she relied on Dr. Countryman's evaluation and report in reaching her conclusion that Routes was not fit for duty. Dr. Countryman's report did not contain a medical opinion as to Routes' abilities or his dangerousness. Dr. Patel's conclusion, therefore, relied also on the information from Gould's letters.

60. That conclusion led to Routes being on LWOP for an indefinite period of time. Because Gould refused to respond to Routes' subsequent requests to be restored to his position, Routes remained on LWOP for more than a year. At no time did the USPS inform Routes about how he might be able to return to work. After one year on LWOP, Routes was separated from his employment with the USPS.

61. Routes has adequately shown by a preponderance of the evidence that the USPS, through Gould, retaliated and discriminated against him for having taken FMLA-protected leave. The Court is not in a position to assess the damages Routes would be entitled to recover under the FMLA because the parties did not include

this issue in their post-trial briefs. Additional briefing will be ordered.

## C. Failure to Restore Claim

62. To prove that he is entitled to recover under his failure to restore claim, Routes must show that in September and October of 1995 he was eligible for FMLA leave, that he took a leave for the intended purpose of FMLA leave, he sought to be restored to his former or an equivalent position, and that the USPS denied, restrained or interfered with his right to restoration.

63. In August of 1995, Routes had worked for the USPS for at least twelve months, and in the previous twelve months he had worked more than 1,250 hours. Ex. B. Because he was hospitalized for inpatient treatment of depression and alcoholism, he satisfies the requirement that he have a serious health condition. *See* 29 U.S.C. § 2611(11). Thus, Routes' absence from August 31, 1995, to October 9, 1995, qualified as FMLA leave. In October of 1995, Routes was released by two doctors to return to work at the Nashville Post Office. Both doctors supplied the information required by Form 380. He contacted Gould and asked to be restored to the position he had held when his leave began. In doing so, Routes was attempting to exercise a substantive right granted to him by the FMLA, and to which he was entitled—unless he was unable to perform an essential function of the position. *Tardie v. Rehabilitation Hosp. of Rhode Island,* 6 F.Supp.2d 125, 132 (D.R.I.1998), *aff'd,* 168 F.3d 538 (1st Cir.1999); 29 C.F.R. § 825.214(b).

64. The USPS relies on *Tardie* in support of its argument that Routes was not entitled to restoration because he could no longer perform the essential function of his job of being available to work seven days a week. Tardie, who was the director of human resources at a hospital, suffered from a stress-related heart condition for which she took a leave of absence. While she was on leave, Tardie contacted her employer to determine whether she would be able to return to her former position because she could no longer work more than forty hours a week. *Tardie,* 6 F.Supp.2d at 128. She was informed that the position of director required that she work more than forty hours a week, so she could not return to that position. *Id.* The court held that being able to work more than forty hours a week was an essential function of Tardie's former position, and that she could no longer perform that function. *Id.* at 132. Consequently, Tardie was not entitled to restoration once she finished her FMLA leave. *Id.* (citing 29 C.F.R. § 825.214(b).)

65. When affirming the trial court's decision, the First Circuit noted that Tardie failed to produce sufficient evidence to "rebut" the hospital's evidence that working extended hours was an essential function of the job. *Tardie v. Rehabilitation Hosp. of Rhode Island,* 168 F.3d 538, 543 (1st Cir.1999). It also noted that the FMLA regulations have articulated an exception to the reinstatement requirement, which is that if the employee is unable to perform an essential function of the job there is no right of restoration. *Id.* at 544 (citing 29 C.F.R. § 825.214(b)). Consequently, a defendant who raises this exception to a plaintiff's substantive right has the burden of proving it. Here, the USPS claims that being *available* to work seven days a week is an "essential function" of the part-time flexible clerk's position. Its evidence included testimony from Gould that he considered it an essential function and told all part-time flexible job candidates about it, his testimony about the hardships of running a small post office if he had to limit Routes to a five day a week schedule, and that Routes was in fact scheduled to work seven days a week approximately 38% of the time between August 1994 and August 1995.

66. The term "function" in essential function, however, complicates the analysis because it traditionally refers to physical functions of the job, such as the ability to lift certain weights, or perform certain movements. Here, the function is

more like a requirement—to be available to work on any of seven days a week for the convenience of the employer. Given that the employer was engaged in the business of delivering the public's mail on a timely basis, and that the volume of mail to be handled can vary widely over time, it is essential to the function of the post office that certain employees be available to be scheduled on a flexible basis corresponding to postal demands. Gould testified that there was no written job description that stated the requirement of seven-day a week availability, and he admitted that no one was hired to replace Routes until March of 1996, or six months after Routes attempted to return to work. The claim of hardship is weakened by the fact that the post office was able to manage with no one in Routes' position for so long—which suggests that the seven day a week requirement was not essential.

67. If there was a written job description showing this requirement as an essential function, it would be given "substantial deference." *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir.1998); *EEOC v. Amego*, 110 F.3d 135, 147 (1st Cir.1997); *Riel v. Electronic Data Sys., Corp.*, 99 F.3d 678, 682 (5th Cir.1996). However, there is no doubt an employer is entitled to define the essential functions of a position. *Webster v. Methodist Occup. Health Ctrs., Inc.*, 141 F.3d 1236, 1238 (7th Cir.1998). The USPS appears to have allowed each postmaster to decide the requirements for the part-time flexible clerks assigned to his or her post office. Routes seemed to understand this requirement, as evidenced by his attempts to become a full-time clerk so he would only be scheduled five days a week. Moreover, the CBA provides that part-time flexible employees "shall be available to work flexible hours as assigned by the Employer during the course of a service week." Ex. 42, Art. 7.1(A)(2). A service week comprises all seven days of the week. *Id.* Art. 8.2(A). Thus, the CBA also supports the USPS' claim that an essential function for part-time flexible clerks is that they be available for work seven days a week. This Court finds that such availability is essential to the operation of the post office in Nashville and, therefore, is an essential function of Routes' position.

68. Given this finding, the Court must now determine whether the USPS demonstrated that Routes was not capable of performing that function. The evidence is that Gould received a release from Dr. Wenzler suggesting that it would be better for Routes if he did not work seven days a week, and one from Dr. Kelly that released Routes with no restrictions. Dr. Wenzler's letter did not address the issue of whether Routes could be available to work seven days a week—only that it would be better if he did not actually work that much. Routes testified, and Gould did not contradict, that he was willing to work seven days a week if necessary. Similarly, Gould admitted that at no time did Routes say he could only work or be available to work five days a week. Rather, Gould confessed there was "quite a bit of confusion" about Routes' "ability to work seven days a week."[20] This evidence falls far short of proving that Routes could no longer perform an essential function of the job.

69. The overall scheme of the FMLA is to protect an employee's job while he or she is on a leave occasioned by a serious

---

**20.** If there was confusion, or some other legitimate concern, about whether Routes could perform an essential function of his job, the USPS should have had its own health care provider contact the employee's health care provider, with the employee's permission, to clarify the employee's fitness to return to work. *See* 29 C.F.R. § 825.310(c); *Albert v. Runyon*, 6 F.Supp.2d 57, 63 (D.Mass.1998) (noting Secretary of Labor declined to allow employers to seek second opinion as to employee's fitness for duty on grounds that statute specifically authorizes second opinions with respect to original medical certification for a leave, but not with respect to the fitness for duty certification). It also appears that the employer may not delay an employee's return to work while it seeks such clarification. 29 C.F.R. § 825.310(c).

health condition, and to protect the employee's medical privacy by having the employer deal with the employee's own health care provider first. *See King*, 166 F.3d at 891 (calling right of restoration a "guarantee"); *Albert v. Runyon*, 6 F.Supp.2d 57, 66 (D.Mass.1998). If not satisfied by that medical certification (*e.g.*, ambiguous release or conflict between two doctors), the statute and implementing regulations establish a mechanism that does not include a FFDE by a medical provider employed by the employer on a regular basis. *Albert*, 6 F.Supp.2d at 62–3 (citing 29 C.F.R. 825.310(c)); *c.f. Diaz*, 131 F.3d at 713 (where employer requested second opinion when employee's two treating physicians provided conflicting information about whether employee had serious health condition). For all these reasons, the Court finds that the "inability to perform an essential function" exception to the right of restoration does not apply.

 70. The USPS also argues that it had the right, under the FMLA, to condition Routes' return to work on a FFDE because such an examination was justified by the CBA, as well as the Americans with Disabilities Act ("ADA") of Rehabilitation Act. This argument cannot prevail for several reasons. With respect to the CBA, the USPS is correct that the provision relating to the employer's ability to condition the employee's restoration on a uniformly applied requirement for medical certification does refer to the effect of a valid CBA. Specifically, the provision reads that nothing in that subparagraph shall supersede a valid CBA that "governs return to work of such employees." 29 U.S.C. § 2614(a)(4). First, no provision of the CBA in this case specifically governs the return to work of an employee who has been on leave due to a serious health condition. Instead, the identified CBA provision merely states that the USPS manuals and rules shall continue in ef-

fect.[21] The vagueness and generality of this language make it unlikely to take precedence over the more specifically-worded FMLA subparagraph in § 2614(a)(4).

71. Second, the right of restoration is a substantive statutory right that is guaranteed to eligible employees by the FMLA. *King*, 166 F.3d at 891. As such, it cannot easily be diminished or abrogated by a collective bargaining agreement. In fact, Congress specifically explained its intent behind the references to a CBA in the FMLA. *See* 29 U.S.C. § 2652. The statute provides that nothing in the FMLA "shall be construed to diminish the obligation of the employer to comply with any collective bargaining agreement ... that provides *greater* family or medical leave rights to employees than the rights established" in the FMLA. 29 U.S.C. § 2652(a) (emphasis added). Similarly, it states that the rights established in the FMLA "shall *not be diminished* by any collective bargaining agreement or any employment benefit program or plan." *Id.* § 2652(b) (emphasis added). By expressly stating that a CBA cannot diminish the employee's FMLA rights, but can only provide greater rights, Congress clarified the expected interrelationship between a valid CBA provision and § 2614(a)(4). If the designated provision of the CBA were read the way the USPS asks, it would diminish the right of restoration established in the FMLA by allowing the USPS to implement its more restrictive return to work policies. Such a result would violate the FMLA.

72. Finally, if the Court were to interpret the postal workers' CBA as incorporating the USPS' more restrictive return to work policies, it would amount to allowing the Union to waive its members' substantive statutory right to restoration after a FMLA leave, without them knowing it. This Court does not interpret the cited FMLA provision to authorize such a gen-

---

**21.** Article 19 of the CBA provides, "[t]hose parts of all handbooks, manuals and published regulations of the Postal Service, that directly relate to wages, hours or working conditions ... shall be continued in effect except that the Employer shall have the right to make changes.... " Ex. 42, Art. 19. There is no specific reference to employees' rights when returning to work from a medical leave.

eral waiver. Routes has cited the Supreme Court's decision in *Wright v. Universal Maritime Serv. Corp.,* which states that for a waiver of a substantive statutory right to be effective against any individual employee, it must be explicit, clear and unmistakable. 525 U.S. 70, 119 S.Ct. 391, 396, 142 L.Ed.2d 361 (1998) (citing *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983)). Although that case dealt with the issue of whether a general arbitration provision in a CBA could waive an employee's statutory right to judicial determination of an ADA claim, it provides relevant guidance for this analysis. The CBA provision at issue does not mention an employee's right to restoration from a FMLA-qualified leave, much less an employee's return to work from any other medical leave. Instead it refers to parts of the USPS handbooks, manuals and published regulations "that directly relate to wages, hours or working conditions." The Court finds that this language is not sufficiently clear, explicit and unmistakable to qualify as a waiver of any employee's FMLA right of restoration. There is no mention in either the CBA or the handbooks and manuals of an employee's FMLA rights, much less how the USPS rules affect those rights. Therefore, the CBA between the Union and the USPS does not incorporate any provisions of the USPS' rules and regulations that would diminish Routes' right to be restored to his former position from a qualified FMLA leave, a right that is limited only by a requirement of medical certification from his own physician. *Albert,* 6 F.Supp.2d at 66.

73. As discussed previously, even if the Court found that the USPS's Handbook and Manual applied to Routes' situation, the designated provisions would not allow Gould to condition Routes' return to work on a FFDE. Moreover, the FMLA is intended to protect employee's jobs while they are on qualifying FMLA leave. *See* 29 U.S.C. § 2601(a)(4) (finding that there exists "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods"). Consequently, an employer may not make an independent assessment of an employee's fitness for duty upon his or her return from a qualifying medical leave, unless the employer would have been allowed to make such an assessment in the absence of the leave. *See Albert,* 6 F.Supp.2d at 66 (citing *Harris v. Department of the Air Force,* 62 M.S.P.R. 524, 528 (1994)); *see also Tardie,* 6 F.Supp.2d at 132.

74. An employee's right of restoration does not entitle him or her to any right, benefit, or position of employment other than what he or she would have been entitled had the employee not taken the leave. 29 U.S.C. § 2614(a)(3)(B). Consequently, if the employer can show that it would have reason to doubt an employee's fitness for duty absent the leave or the underlying medical condition, then it would be entitled to apply its own policies or procedures for making that determination. *Albert,* 6 F.Supp.2d at 65 (citing 29 C.F.R. § 825.216(a)).

75. For example, in *Tardie,* the employee had recovered from her temporary disabling condition enough to return to work, but she returned with a limitation that prevented her from performing an essential function of her former position. *Tardie,* 6 F.Supp.2d at 132. The court found that the employer could have terminated her even if she had not taken FMLA leave, if she were so limited.[22] *Id.* Another example is found in a case from the Northern District of Illinois in which the employee had been failing to meet her employer's legitimate performance expectations prior

---

**22.** The *Tardie* court had fully considered whether Tardie was a qualified individual with a disability, which would have entitled her to a reasonable accommodation and thereby protected her from discharge. 6 F.Supp.2d at 129. Because she was able to work forty hours a week, and thus able to perform other jobs requiring only that number of hours, Tardie was not considered to be a qualified individual with a disability. *Id.* at 130.

to taking leave, and the court found that the employer's refusal to restore her to her former position was not a violation of the FMLA. *Hubbard v. Blue Cross Blue Shield Assoc.*, 1 F.Supp.2d 867, 877 (N.D.Ill.1998). The *Hubbard* court based its decision on the fact that the employer had successfully demonstrated that Hubbard would have been terminated because of poor performance regardless of whether she took a leave. *Id.*

76. Similarly, the district court in *Albert* held that the USPS could not order a psychiatric fitness-for-duty examination of an employee who had taken medical leave for treatment of major depression, when it would not have required the employee to undergo such an examination had she not taken FMLA leave. 6 F.Supp.2d at 66. "The requirement that an employee be returned to duty without delay upon the employer's receipt of fitness-for-duty certification would be nullified if the fact that an employee had taken leave under the FMLA ... could be a sufficient reason to question her ability to work." *Id.* When an employee submits a medical certification adequate for purposes of the FMLA (such as a Form 380), and the employer has no independent reason to doubt the employee's fitness, "the employer cannot rely on the employee's FMLA leave (or [his or her] prior medical condition) to justify such an examination." *Id.*

■ 77. Once an employee has returned to work based on an adequate medical certification from his or her own doctor, an employer may order a FFDE if the employee's post-reinstatement behavior indicates such an evaluation is warranted. *Albert*, 6 F.Supp.2d at 66. Alternatively, if the employer can show that prior conduct of the employee, unrelated to the underlying temporarily-disabling medical condition, would have justified a FFDE, then such an examination would be justified. However, when an employee's pre-leave conduct and medical certification are adequate to satisfy the requirements of the FMLA,[23] the employer may not take actions against the employee merely because the certification does not satisfy the employer's more restrictive standards. *Id.*

■ 78. Like the plaintiff in *Albert*, Routes presented his employer with adequate medical certification—a Form 380 from Dr. Wenzler and an unrestricted release to return to work from Dr. Kelly. *See* 29 C.F.R. § 825.306 (referring to Department of Labor's optional form WH–380). The USPS has offered no evidence that would justify a FFDE of Routes had he not taken FMLA leave. Instead, Gould admitted that he sought a FFDE because Routes had taken FMLA leave for treatment of major depression and alcoholism.

79. None of the conduct identified by Gould, absent the fact of Routes' FMLA leave for treatment of major depression and alcoholism, would have led Gould to request a FFDE of Routes. Most of the conduct occurred in the distant past and did not lead to any disciplinary action, much less a need to challenge Routes' fitness for duty. One incident, the absence on August 31, 1995, constituted FMLA leave, which cannot provide an independent basis for a FFDE exam. Nor could the fact that Routes had suicidal ideas when he was admitted to the hospital, or that he was an alcoholic who had a relapse.

---

**23.** A return to work certification under the FMLA need only state that the employee is able to resume work. 29 U.S.C. § 2614(a)(4). The implementing regulations further clarify the requirements by stating that the fitness-for-duty certification need only address the particular health condition for which leave was sought and "need only be a simple statement of the employee's ability to return to work. No additional information may be acquired, and clarification may be requested only for the serious health condition for which FMLA leave was taken." 29 C.F.R. § 825.310(c). Although administrative interpretations of a statute by the enforcing agency are "not controlling upon the courts by reason of their authority," they do "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Porter v. U.S. Alumoweld Co., Inc.*, 125 F.3d 243, 246 (4th Cir.1997) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

These are the underlying medical conditions for which Routes took FMLA leave.

80. Gould's contention that a FFDE is automatic under USPS rules and regulations cannot comprise an independent justification for a FFDE. The USPS' regulations cannot "impose further conditions on an employee's exercise of rights under the FMLA," given the prohibition against employers interfering with or restraining the exercise of an employee's FMLA rights. *See Albert,* 6 F.Supp.2d at 67 (citing 29 U.S.C. § 2615(a)(1)). Although the *Albert* court observed that the FMLA suggests that additional conditions may be imposed in certain limited circumstances, such as by state or local laws or a valid CBA provision, those circumstances are not present here. The Court has already found that the CBA in this case does not specifically address an employee's right to return to work following a qualifying medical leave, which means it is superseded by the FMLA and its regulations. For all these reasons, the Court finds that the USPS was not justified in conditioning Routes' return to work on a FFDE by its own rules and regulations.

81. Finally, the USPS argues that the FFDE was justified because the FMLA was meant to be read in harmony with other statutes that relate to employees with serious health conditions, such as the Rehabilitation Act and the ADA. Consequently, the USPS claims that these statutes allow it to order a FFDE of Routes as long as it is "job-related" and "consistent with business necessity." 42 U.S.C. § 12112(d)(4). In *Albert,* the USPS made a similar argument, stating that the employee's doctor's certifications did not "adequately allay its concerns about Albert's ability to perform the essential functions of her position in the face of the 'erratic behavior' she allegedly exhibited prior to taking leave." 6 F.Supp.2d at 67. An analogous argument has been presented by Gould, in that he began to view Routes' prior conduct in the workplace in a new light once he learned Routes had been hospitalized for "suicidal tendencies." Thus, the USPS argues that conditioning reinstatement on the employee submitting to a FFDE does not violate the FMLA as long as it is consistent with the ADA and Rehabilitation Act standards.

82. In support of this contention, the USPS cites a Fourth Circuit case in which the employee injured his back on the job, applied for workers' compensation, was denied, took a personal leave of absence for a short period of time, during which his employer wrote him and said that before he could return to work he must submit documentation of his ability to perform the essential functions of his position. *Porter v. U.S. Alumoweld Co., Inc.,* 125 F.3d 243, 245, (4th Cir.1997). It is not clear whether Porter was eligible for and taking FMLA leave, or attempting to return to work from a qualifying leave. Instead, he had back surgery approximately six months after his injury and his physician released him several weeks later, with a note that said he was "doing well" and that he was "able to return to work safely without any limitations." *Id.* Alumoweld contacted the doctor and asked for more information (a functional capacity evaluation), to which the doctor responded that he did not perform such tests. Porter was then told he must obtain such an evaluation, at his own expense, before he could return to work. *Id.* He refused to do so and he was fired as a result.

83. Porter sued Alumoweld for allegedly violating the ADA, the FMLA and the state's workers' compensation statute. *Id.* at 246. The court held that the medical examination Porter was required to undergo was allowed by the ADA, and that his termination for not complying with the requirement did not violate the ADA. *Id.* The issue was whether the examination was "job related" and "consistent with business necessity." Citing the EEOC regulations relating to when a medical examination fits that category, the court found that because Porter had an on-the-job injury that appeared to affect his ability to perform essential job functions, the requested medical evaluation was job-re-

lated and consistent with business necessity. *Id.*

84. In two short paragraphs the *Porter* court also considered whether the requirement that Porter undergo the medical evaluation violated the FMLA. *Id.* at 247. Porter contended that the FMLA and its regulations only required him to submit a "fitness-for-duty certification" from his own physician, with a simple statement that he could return to work. *Id.* Thus, he argued, Alumoweld had no right to ask for more, even if it did comply with the ADA. *Id.* The court noted that the FMLA specifically refers to the ADA and its "return-to-work physical." Consequently, the court disagreed with Porter's reading of the FMLA, because to accept it would mean the FMLA would be automatically violated every time an employer requested a "fitness for duty exam under the ADA." *Id.* Rather than attempt to reconcile the two statutes, the court merely rejected Porter's effort to so restrict the operation of the ADA.

85. This Court is not satisfied that *Porter* adequately resolved the issues in this case. Routes was attempting to exercise his right to be restored to his former position, and he submitted medical certifications of his ability to return to work that were adequate under the FMLA. Like the plaintiff in *Albert,* Routes was denied the chance to return to work until he submitted to a psychiatric FFDE, supposedly because there was doubt as to whether he could perform the essential functions of his position. That doubt, however, arose out of the fact that Routes had taken the leave and the reason for it. As the *Albert* court properly observed that just because "the ADA does not preclude employers from requiring employees who suffer performance problems that may be health related to undergo medical examinations does not mean that the FMLA permits all such examinations." *Albert,* 6 F.Supp.2d at 67. In other words, the real issue in this case, as in *Albert,* is determining the exact interrelationship between the provisions of the two statutes as they relate to an employee returning to work from a FMLA leave.

86. The ADA does not give employers an "affirmative right" to conduct job-related examinations, but "merely exempts such examinations from its prohibitions." *Id.* (citing 42 U.S.C. § 12112(d)(4)(A)). Because both of these statutes attempt to protect workers' rights, it would be odd if the ADA were interpreted to deprive an employee of a right explicitly granted in the FMLA. *Albert,* 6 F.Supp.2d at 68, n. 6. Porter argued that the FMLA prohibited employers from requiring any and all return to work physical examinations, which the Fourth Circuit properly rejected. Whereas, what is argued here is that Routes' return to work from FMLA leave does not by itself provide sufficient business justification to satisfy the ADA and Rehabilitation Act standards. *See Albert,* 6 F.Supp.2d at 68.

87. Instead, the business needs of the USPS were met by a medical certification from Routes' health care provider that was adequate to satisfy the FMLA, unless that certification gave the USPS a "present reason to doubt" Routes' ability to work. The FMLA leaves it in the hands of the health care provider, not the employer, "to evaluate an employee's health condition to determine if [he or she] is sufficiently recovered to return to work." *Id.* At 69. Thus, the employer cannot claim that "its inability to independently assess the employee's health" justifies a FFDE. Something more is needed, and that something must be independent of the fact that an employee took FMLA leave or the underlying medical condition from which he has recovered sufficiently to return to work. As the *Albert* court noted, an employer may have sufficient justification to require an employee returning from FMLA leave to undergo a FFDE "only if [he] suffers from a continuing disability that the employer has reason to believe might affect [his] job performance." *Id.*

88. Applying this logic to the facts in this case, the Court notes that it

has already determined that Gould did not have an independent justification for a FFDE, absent the FMLA leave and Routes' underlying medical condition. Nor was such an evaluation justified by Routes returning to work with a disability that gave Gould a reasonable doubt that he could perform the essential functions of his position. Gould admitted at trial that he received to releases for Routes to return to work and neither one of them restricted Routes to light duty. Rather, he noted some confusion about whether Routes could continue to work seven days a week. That confusion should have been resolved using the mechanisms available under the FMLA, of having the medical officer of the USPS contact Routes' health care provider, with Routes' permission, to determine whether Routes were no longer able to perform the essential function of being available to work seven days a week. Only after getting a clarification from Dr. Wenzler that Routes was restricted from performing that function would the USPS have had a business necessity to order a FFDE consistent with the ADA and Rehabilitation Act standards. Consequently, this Court finds that the FFDE ordered by the USPS before Routes could return to work, violated his right of restoration under the FMLA.

### III. CONCLUSION

The Court has found that by ordering Routes to undergo an evaluation of his fitness for duty, the USPS violated his rights under the provisions of the FMLA. Routes has succeeded in proving by a preponderance of the evidence a violation of the FMLA under both of his legal theories. First he has shown that his supervisor, Gould, reacted negatively to his exercise of his right to take a medical leave in December of 1994 that qualified for protection under the FMLA. Gould's negative reaction then affected and influenced subsequent employment decisions he made that adversely affected Routes. Because those decisions led to Routes being subjected to an unjustified FFDE, and because Gould provided information about Routes to those performing the FFDE that was exaggerated and inaccurate, Routes succeeded in proving that he was retaliated against for having exercised his FMLA rights. Second, Routes' claim that his substantive right to be restored to his former position, or an equivalent one, succeeds because Routes was released to return to work without being restricted in a way that prevented him from performing the essential functions of his job.

Although Routes has proven a violation of the FMLA under two theories, he is only entitled to one recovery. The elements of damages to which he is entitled include any wages, salary, employment benefits, or other compensation denied or lost by reason of the violation; any actual monetary losses sustained as a direct result of the violation; interest on the amount awarded for lost wages and for monetary losses; and an additional amount as liquidated damages, unless the employer proves that the act that constituted a violation of the FMLA was in good faith and the employer had reasonable grounds for believing it was not a violation. 29 U.S.C. § 2617. The Court may also order equitable relief if it is appropriate, including employment, reinstatement, and promotion.

The proper scope and measure of the damages to which Routes may be entitled has not been briefed, and the parties are hereby ordered to submit briefing on these issues as follows: the plaintiff is to file a brief within thirty (30) days of the date of this order; the defendant will have thirty (30) days after that to file a response; and the plaintiff shall have fifteen (15) days from the date of the defendant's response to file a reply. Given the Court's finding that Gould retaliated and discriminated against Routes for having taken a leave that would have qualified as FMLA leave in December of 1994, the issue of liquidated damages need not be briefed. The Court finds that Routes is entitled to liquidated damages as a matter of law under these circumstances. In addition, because

Routes admitted at trial that he lied on an official USPS form, this Court will not provide any equitable relief in the form of reinstatement. All other issues relating to damages may be briefed by the parties. Given the uncertainty of the interrelationship between the FMLA and postal regulations and the FMLA and the ADA, the Court orders each side to bear its own costs.